BOATMAN, ET AL. v. ANDRE and three other cases
(Nos. 1737-1740; June 11, 1932; 12 Pac. (2d) 370)

For the appellant there was a brief by *C. J. Andre pro se,* of St. Paul, Minn., and *Mr. C. R. Ellery,* of Cheyenne, Wyoming, and oral argument by *Mr. Ellery.*

354

For the respondents there was a brief and oral arguments by *E. C. Raymond, E. E. Wakeman* and *R. G. Diefenderfer,* of Newcastle, Wyoming.

RINER, Justice.

These four cases are here by direct appeal to review judgments rendered in each of them by the District Court of Weston County. All the actions as instituted in that court were suits to quiet title of the several plaintiffs to certain lands owned by them as against the claims of some interest in said lands on the part of the several defendants. In the court below, by the stipulation of the parties, the suits were tried as one proceeding and it was agreed, in effect, that the transcript of testimony thereafter made up by the court reporter should stand as such in each. The several appeals were argued together in this court and may properly be disposed of by one opinion.

The defendant and appellant Andre, Trustee, answered and filed a cross-petition in each of the suits alleging that he was the owner by assignment of an oil and gas lease given by plaintiffs covering the lands described in their petition, the conditions of which lease, he and his predecessors had duly performed and which had never been terminated. To these answers and cross-petitions, the plaintiffs replied and answered, admitting Andre's ownership of the several leases pleaded by him, but denying that he and his predecessors in interest had performed as required by their terms and alleging the abandonment of drilling operations and also, the leases.

The cases were tried to the court without a jury with the result that, in each one, there was entered a judgment and decree finding generally for the plaintiffs and against the defendant Andre upon all the issues therein and adjudging that plaintiffs' title to the several premises be quieted and that the said defendant had no interest in them.

It is assigned as error that the judgments are unsupported by sufficient evidence and are contrary to law. The matter chiefly argued by the parties is whether the trial court was, in that respect, wrong in finding that the defendant Andre had abandoned the four leases and this appears to be the controlling question submitted for our determina-

tion. An examination of the record discloses substantially the following facts:

The Boatman, Kraft and Brown leases are similar in form and each, with variation as to the amount payable under the last paragraph in the quotation given below, contained this language:

"If no well is spudded in or no drilling machine is on said ground within............from this date, then this grant shall be null and void unless second party shall pay to first party............Dollars for each............thereafter that such spudding or moving a drilling machine on said ground is delayed.

"The terms of this instrument shall be for Five years from date hereof, and so much longer as oil or gas shall be found in paying quantities. In case no well is drilled and no rental paid, as above specified, then this instrument shall be void and terminate at the option of either party.

"If operations are not started on or before October 1st, 1928, within one mile of said lands with a Standard drilling rig, capable of drilling to a depth of 4000 feet, this grant shall be null and void, unless second party, his successors or assigns, shall pay to the first party the sum of $480.00 per annum, payable quarterly, to-wit $120.00 per quarter, in advance."

The Sackett lease contained, among other provisions, these:

"6. IT IS UNDERSTOOD AND AGREED that operations have been started on and before October 1, 1928, for the drilling of a well for oil and gas on Lots three (3) and four (4) and the east half of the southwest quarter (E½SW¼) of Section 19; Lots one (1) and two (2), East half of Northwest Quarter (E½NW¼) of Section 30, Township 46 North, of Range 64 West of the Sixth Principal Meridian, Weston County, Wyoming, and if said operations and drilling are not continued thereon within ½ miles of the land herein described with a standard rig capable of drilling to a depth of four thousand feet, this lease shall terminate as to both parties and this grant shall be null and void, * * *

358

"16. IT IS UNDERSTOOD AND AGREED that failure on the part of the lessee to comply with all and several of the terms of this grant shall not thereby render this lease null and void, but in such case the lessors shall notify said lessee of such breach by registered mail, or personally, immediately upon receipt by lessors of information of the same, in which case the lessee shall have thirty (30) days from the date of the receipt of such notice by registered mail, or personally, from the lessors to remedy said breach, and if the same has not been remedied within said thirty (30) days, this lease shall, at the option of the lessors, thereupon be and become null and void and of no further force and effect without further notice of the lessee, his successors or assigns. * * *

"20. AND IT IS FURTHER AGREED that the lessee, his heirs or assigns, shall have the right at any time to surrender this lease, then and from that time this lease and agreement shall be null and void and no longer binding upon either party, * * *."

Testimony was given on the trial that drilling operations to put down a well were duly begun about October 1, 1928 on land leased by A. W. Witzel and Ethel K. Witzel to one John O'Brien and ultimately assigned by the latter to the Osage-Wyoming Oil Company, a corporation, of which the defendant Andre was president; that this well, while not upon any of the lands embraced in the leases in question in the present litigation, was close enough to said lands to comply with the requirements of those leases so far as location of the well is concerned; that with sundry interruptions caused by weather and road conditions and also by reason of lack of funds, drilling was continued on the Witzel land until July 23, 1930; that early in 1930 this well had reached a depth of 1100 feet, but in the spring of that year, in an effort to extract some casing, the latter parted, so that the drilling rig was moved some distance and a new well begun which, by July 23, 1930, had reached a depth of 1200 feet; that the Osage-Wyoming Oil Company by that time had spent over $35,000 and the well was still uncompleted, not having been sunk to any possible producing oil

sands; that further drilling of the well ceased on July 23, 1930; that the drilling crew remained on the premises waiting to be paid their wages until about the middle of September when Andre came and gave them their money, whereupon all left except the head driller, one Nelson, who stayed until about November 25, 1930; that at the time the men were being paid off, Andre told one Martens, an employe of the company then, that his (Andre's) company (referring to the Osage-Wyoming Oil Company) was "broke"; that they could not operate because they did not have any money.

It appears, also, by the record that Andre, as president of the Osage-Wyoming Oil Company, sent to all of the plaintiffs and to others interested a letter, under date of September 19, 1930, which read in part:

"The situation therefore amounts to this: There are several groups ready, able and willing to take over the Fiddler Creek project and to finish the well, provided we first get our leases fixed up and get the required amount of acreage around the well. The land owners, on the other hand, say they will not give new leases or more acreage until the well is further along. This is impossible without more money. In other words, there is a deadlock which leaves our company helpless.

"We have 1200 feet of hole which is in excellent condition with 12½ inch casing set within ten feet of the bottom. We have a good drilling rig and good equipment on the ground. We have had a good crew there, but have been compelled to dismiss them temporarily.

"We have a good camp and the outfit as a whole is such that we should easily be able to drill to the Muddy Sand, which is supposed to be at about 3,000 feet, and should be able to go considerably deeper if necessary. All we need is money for casing and pay roll, but cannot get it for the reason stated. Therefore, all we can do is to discontinue drilling until we can get enough money from the production on our other lease at Osage. That will take time. If, in the meantime, our leases at Fiddler Creek expire or are cancelled all we can do is to plug the hole and move our rig back to Osage. Then it will probably be a long, long time before someone else will care to spend any more money for drilling at Fiddler Creek."

At the trial, Mr. Andre himself testified concerning the financial condition of his company and his reason for writing this letter, that:

"In July, 1930, it became clear to us that our stockholders couldn't carry on as they had and that we should look to outsiders for financial aid, and we began to do so, negotiating with different ones.

"We had a number of offers from different people to finish the well over there, but there was always the same objection, that our leases were in poor condition and that we would have to get more acreage. We attempted to do so, but without any success. So far as the land owners were concerned, they seemed to understand the trouble we were in and seemed to be prejudiced, and we were unable to get new leases or more acreage.   *   *   *   It was quite apparent that if we were to go on and get outsiders to help us out, it would be necessary to inaugurate a campaign among the owners out there to get more leases and a correction of some of the existing leases. With that in view and for that purpose, and none other, this letter to Mr. Martens was written."

However, this letter produced no results, for the lessors of the several leases declined to give any new ones or enlarge the acreage already leased. Three or four days after September 29, 1930, the original lessee of the Witzel lease aforesaid, which had been passed by assignment on to the Osage-Wyoming Oil Company, received a notice declaring the instrument void thirty days from date for failure to continue drilling and the non-payment of rental in lieu thereof, as required in said lease.

While Andre testified that his company, "up until December, at least," continued its efforts to raise funds to pay its debts and "get things in shape" to continue drilling, still, a number of weeks before that time and on October 18, 1930, the Osage-Wyoming Oil Company assigned to one Charles Brittan all the leases held by it on the Fiddler Creek structure, the structure on which all the lands leased by the instruments here involved are located, including the

Witzel lease aforesaid, where the uncompleted well was. This assignment was an unqualified transfer of all the company's interest in said leases and disclosed no reservation to it or to defendant Andre of any rights whatsoever therein and there seems to be no proof that they retained any. On the same day, the company last mentioned also gave Brittan a bill of sale to "all of our right, title and interest in and to all personal property wherever situated in the State of Wyoming belonging to us, and especially as to all drilling equipment, supplies and property of every kind and character situated on that certain oil structure known as the Fiddler Creek structure in Weston County, Wyoming."

Brittan, within a day or two of the date of these instruments, took possession of the drilling rig, boiler tools, casing, and the uncompleted well at Fiddler Creek and made arrangements for a caretaker of this property. After October 18, 1930, the Osage-Wyoming Oil Company never had any other drilling rig in that vicinity. At the time of the trial of these cases on May 5, 1931, it conclusively appeared that no drilling of any sort had been done by anyone, either on the land described in the leases given by plaintiffs or within one mile thereof, since July 23, 1930. Brittan, as a witness, testified that he himself would do no drilling unless titles to the leased land could be cleared and satisfactory acreage obtained and that he would not, in any event, do any drilling under the leases assigned by the Osage-Wyoming Oil Company. Andre, as a witness, other than as indicated above, appears to have disclosed no intention nor ability to continue the drilling work, either on his part or on the part of the company of which he was an official.

While it is settled that title to land cannot be lost by abandonment (3 Washburn, Real Property 77, 1 C. J. 10; East Tennessee Iron & Coal Co. v. Wiggin, 68 Fed. 446), it is equally well established that the interest of a lessee under the ordinary form of oil and gas lease presents a right of a

different character. That right, created by the lease, is merely to search for oil and gas and, if either is found, to remove it from the land leased. This would appear to make it a *profit a prendre* (2 Tiffany, Real Property, 2nd Ed., § 385, p. 1397; 18 Mich. L. Rev. 773; 31 Har. L. Rev. 882; 25 W. Va. L. Q. 295; 40 C. J. 978, § 564) and hence, an incorporeal hereditament, which may be lost by abandonment. (3 Washburn, Real Property 77; Thompson, Title to Real Property, § 108, p. 131)

In accord with the great weight of authority, this court has said in Phillips v. Hamilton, 17 Wyo. 41, 95 Pac. 846, 848:

" 'Abandonment is the relinquishment or surrender of rights or property by one person to another; it includes both the intention to abandon and the external act by which the intention is carried into effect.' (1 Enc. Law 1.) 'In determining whether one has abandoned his property or rights, the intention is the first and paramount object of inquiry; for there can be no abandonment without the intention to abandon.' (1 Cyc. 5.) "

However, abandonment will be more readily found in cases of oil and gas leases than in most other instances. I Thornton, Law of Oil and Gas (4th Ed.), § 155, p. 445; Hall v. Augur, 82 Cal. App. 594, 256 Pac. 232; Harris v. Riggs, 63 Ind. App. 201, 112 N. E. 36, 39. This is so because, as it has been reasonably said in Harris v. Riggs, supra:

"The rights granted under such leases are for exploration and development. The title or interest granted is inchoate until oil or gas is found in quantities warranting operation, and courts will not permit the lessee to fail in development and hold the lease for speculative or other purposes, except in strict compliance with his contract for a valuable and sufficient consideration other than such development."

Whether there has been an abandonment is to be determined by all the facts and circumstances surrounding each particular case. Mills and Willingham, Law of Oil and Gas, § 117. And the text last mentioned further says in that connection:

"Where, however, a royalty is reserved to the grantee payable from production, it is manifest that the parties intended to embark upon a mining enterprise, and the right to explore the premises was granted as an incident thereto. The courts have, therefore, held that a grant of the land in an instrument that creates a lease, as distinguished from a mineral deed, is incidental to the consummation of the purpose of the parties, viz., the exploration and discovery of oil or gas in paying quantities, and the development of the premises to their mutual profit.

"The question whether, in any case, the lease has been abandoned, depends upon the intent of the lessee. But this intent is to be determined by his attitude towards the enterprise as a whole. He might intend to hold the land itself, without any intention of proceeding to test the premises for oil and gas; but having abandoned the purpose of the lease, he will be held to have abandoned the land which was granted as an incident of the enterprise."

On the subject of what facts are to be regarded as evidence of abandonment, Summers, Oil and Gas, § 166, p. 525-6, says upon the authority of many cases:

"Where a lessee has entered the premises and has attempted to drill a well, or has drilled one into the oil and gas sands which proves to be unproductive, and thereafter physically abandons the premises by allowing the derrick and other fixtures to get out of repair, or removes all machinery from the land and does nothing more for an unreasonable length of time, many courts have held that such facts support a finding of abandonment and cancel the lease at the suit of the lessor."

In Hall v. Augur, supra, it was held that the lessees had abandoned an oil and gas lease where they failed to

perform any of the covenants of the lease regarding drilling except to erect a derrick, had told the agent of the lessors they would not be able to proceed, and had assigned their interests.

In Aye v. Philadelphia Co., 193 Pa. 451, 44 Atl. 555, 556, 74 Am. St. Rep. 696, discussing this matter, the court said:

"The rule in regard to contracts is that where the parties have expressly agreed on what shall be done there is no room for the implication of anything not so stipulated for, and this rule is equally applicable to oil and gas leases as to other contracts. There is nothing peculiar about them in this respect. But here the parties have provided for a test well, and for what shall be done if it produces oil in paying quantities. But the other contingency, that it prove dry, is not provided for, and it is the omitted case that has occurred. The authorities are uniform that under such circumstances there is an implied obligation on the lessee to proceed with the exploration and development of the land, with reasonable diligence, according to the usual course of the business, and a failure to do so amounts to an abandonment which will sustain a re-entry by the lessor."

On the same subject, in Hall v. McClesky, 228 S. W. (Tex. Civ. App.) 1004, 1005, a case cited by appellant, this language was used:

"Abandonment is a question of intention, but this intention may be established by circumstantial evidence, such as the removal of machinery, quitting the premises, and other circumstances showing an intention to relinquish all rights and interest in the leased premises. Oil & Gas Rights, Morrison-De Soto, p. 110; Calhoon v. Neely, 201 Pa. 97, 50 Atl. 967. When the unsuccessful search for oil is abandoned, the inchoate title of the explorer for mineral is lost. Garrett v. South Penn Oil Co., 66 W. Va. 587, 66 S. E. 741; Eastern Oil Co. v. Coulehan, 65 W. Va. 531, 64 S. E. 836. Long delay is proof of abandonment, which will justify cancellation of the lease. Chandler v.

French, 73 W. Va. 658, 81 S. E. 825, L. R. A. 1915B, 561; Acme Oil, etc. Co. v. Williams, 140 Cal. 681, 74 Pac. 296. The presence of a forfeiture clause is not necessary to allow of this result. Smith v. Root, 66 W. Va. 633, 66 S. E. 1005, 30 L. R. A. (N. S.) 176. Except in the case of a perfect legal title to a corporeal hereditament, every right or interest in, title to, or ownership of property may be lost by abandonment. This rule applies to mining rights and privileges."

So in Rawlings v. Armel, 70 Kan. 778, 79 Pac. 683, 685, the court discusses the same question in these words:

"The fourth and fifth assignments of error assert that the judgment is not sufficiently sustained either by fact or by law. The court found generally for the plaintiff, and hence found that the lessee abandoned the leased premises. The question of abandonment is one of fact, depending upon intention and conduct. Thornton, Law Relating to Oil and Gas, § 137; Bryan, Law of Petroleum & Natural Gas, § 205. See, also, 2 Snyder on Mines, § 572. If, when the lessee removed the casing from the dry wells, removed its material, machinery, and tools, went away from the land, and neglected to pay rent, it did so intending never to return, the court was justified in finding that it abandoned the project. The lease bore a well-understood character. The contemplated benefit to the lessor consisted in royalties. The provision for rent was not, as in Rose v. Lanyon, 68 Kan. 126, 74 Pac. 625, an alternative which the lessee might adopt, and thereby relieve itself from drilling and operating. Its purpose was to incite speedy development of the property, and hence early payment of royalties. The lessee had the right to enter and explore, and to operate if oil or gas were discovered, but no estate in the land vested unless mineral should be found and worked. Until that time the preliminary right was of such a character that it could be lost by abandonment without the lapse of time prescribed by the statute of limitations."

Although the lessee may testify that he did not mean to abandon the premises (Bartley v. Phillips, 179 Pa. 175,

36 Atl. 217; Hall v. McClesky, supra), yet his testimony will not be controlling and his actual conduct at the time may be resorted to for the purpose of indicating the existence of an intent to abandon. As remarked in Logan, etc. Fuel Co. v. Great Southern Gas & Oil Co., 126 Fed. 623, 626:

"Counsel for the appellant contend that it had no intention of abandoning the contract, and that there can be no abandonment without a purpose to abandon. This proposition of law is no doubt correct, but in business transactions a man's intention is to be gathered from his conduct, rather than from what he meditates, if the latter is inconsistent with the former. Besides, it is a well-settled rule in the law of contracts that if the party upon whom rests the burden of active performance fails to proceed with it in substantial accordance with his stipulations the other party may treat it as abandoned."

Of similar purport is the view of the Supreme Court of Iowa in McColl v. Bear Creek Coal Mining Co., 162 Ia. 491, 143 N. W. 532, 536, expressed thus:

"There was no work done on plaintiffs' land of any kind after about October, 1909. There is no dispute as to this. The defendant may have done all that it could do under methods now known to reach this coal. In our opinion, the defendant became satisfied that it could not reach the coal, and that this is a reason why they did abandon the contract. Whether defendant abandoned the contract and its rights thereunder is a question of fact. There was a conflict in the evidence at some places. From all the facts and circumstances shown by the evidence, we are satisfied with the finding of the trial court that, after testing the premises to its satisfaction and believing the same were of no value to it, defendant did in fact voluntarily abandon the lease and the rights under it, and that it intended to do so. The president of the company says they did not intend to abandon, but this is not conclusive. 27 Cyc. 598. The intent must be determined from all the facts and circumstances shown."

Citing many cases, the annotator, in Ann. Cas. 1917E, 1146, summarizes and concludes to the following effect:

"And, while abandonment, as a rule is a matter of intention and generally a question of fact, the courts have held, as a matter of law that, where the lessee fails to operate properly the premises or his conduct is such, with respect to his obligation, that reasonable men can conclude an intention on his part not to operate, there has been an abandonment of the lease."

With the foregoing authorities in mind, as applied to the facts recited above as appearing in these cases, we are unable to say that there is no substantial evidence to support the finding and judgment of the trial court. Hunt v. City of Laramie, 26 Wyo. 160, 181 Pac. 137; Bissinger and Co. v. Weiss, 27 Wyo. 262, 195 Pac. 527; McFadden v. French, 29 Wyo. 401, 213 Pac. 760; White Automobile Co. v. Hamilton, 31 Wyo. 390, 226 Pac. 687.

To recapitulate briefly, we may not overlook that the District Court had before it evidence that, after July 23, 1930, neither the defendant nor his company, the Osage-Wyoming Oil Company, had funds to go on with the drilling of the well they had commenced, but had not completed; that they endeavored for a while to obtain these funds or to get others to take over the work; that they wholly failed in this endeavor; that they were served with cancellation notice relative to the lease of the land on which all their operations had been conducted; that the Osage-Wyoming Oil Company then sold to another every item of personal property it had in this state, including its drilling rig on said lease, with its appurtenances, tools, and casing; that said company unqualifiedly transferred said lease, as well as all its interest in all other leases which it held on the geological oil structure the leases were given to develop to another party who told the court on the trial that he would not drill under the leases thus obtained; and that since July 23, 1930, to the

date of the trial, May 5, 1931, no one had made any effort in commencing or in continuing drilling operations as contemplated by the leases in question or evinced a bona fide intention so to do.

It can hardly be said that the several leases were given with the idea that the land embraced therein should remain unsearched for oil and gas during an indefinite period. An inspection of their terms establishes that all the instruments contemplate the payment of royalties by the lessee to the lessors upon the discovery of oil and gas upon the premises involved. Three of them provide that if no well is drilled—and this means a completed well (Texas Pacific Coal & Oil Co. v. Harris, 230 S. W. (Tex. Civ. App.) 237)—the leases were to terminate at the option of either party. The other lease, while worded somewhat differently, also contemplated continuous drilling operations and, further, permitted a surrender of the same at any time by the lessee or his assigns. Hence, the obvious purpose of the several leases was the speedy and reasonable development of the property affected. It would seem that the defendant Andre and his company had placed themselves in such case by their acts and conduct as that it may be fairly said, the trial court was justified in concluding that they had abandoned their right to continue their search for the minerals whose discovery was the prime object of the agreements of the parties.

Our conclusion is that the judgments of the District Court should, in each case, be affirmed.

*Affirmed.*

KIMBALL, C. J., and BLUME, J., concur.