## MEAGHER v. UINTAH GAS CO., et al.

No. 6972.   Decided October 27, 1947.   (185 P. 2d 747.)

See 40 C. J., Mines and Minerals, sec. 723.  Time for drilling additional wells in productive territory under oil and gas lease, see note, 14 A. L. R. 967.  See, also, 24 Am. Jur., 540.

*Gustin & Richards* and *Ingebretsen, Ray, Rawlins & Christensen,* all of Salt Lake City, for appellants.

*Katherine M. Ivers,* of Park City, for respondent.

PRATT, Justice.

This is a proceeding to quiet title in which the issues are founded upon the interpretation of an instrument designated an oil and gas lease. The lower court decided in favor of plaintiff (respondent), and to the effect that the oil rights had terminated by the express provisions of the lease; and the gas rights had been abandoned.

The land in question was originally owned by people by the name of Sheridans. They executed the instrument in its original form in favor of one Hill as lessee. This was on June 4, 1924. By mesne conveyances (November 14, 1924 to Smith and December 19, 1927 Smith, et ux to plaintiff) the fee of the land came into the hands of plaintiff Meagher. There is evidence in the case that indicates that there was an outstanding undivided one-fifth interest in the land which plaintiff acquired May 28, 1931 from one Alexander, who in turn had acquired it from Smith, et ux December 19, 1927. This fact, however, does not affect the decision.

On October 30, 1924, Hill granted the Utah Oil Refining Company "the exclusive right of possession and occupancy during the life of said Oil and Gas Lease of June 4, 1924." Thereafter, on November 10, 1924, Hill assigned his interest in this last mentioned agreement to the Ashley Valley Oil Company. This company thus acquired its first interest on November 10, 1924, not in 1927 as found by the lower court.

Apparently to settle any differences between the Utah Oil Refining Company and the Ashley Valley Oil Company, the former relinquished part of its interest to the latter on March 21, 1929.

On April 24, 1929 the Utah Oil Refining Company assigned its remaining interests in the land to Ray Phebus and Paul Stock. On May 29, 1929 these assignees assigned their gas rights to the Valley Fuel Supply Company. On April 30, 1931 these assignees (Stock and Phebus) assigned their oil rights to the Standard Oil Company of California. This company assigned its rights to a company known as the California Company, which in turn released the rights back to Phebus and Stock. These transfers were approved by the Ashley Valley Oil Company.

The Valley Fuel Supply Company, the assignees of the assignment dated May 29, 1929 executed by Phebus and Stock, in conjunction with the Uintah Gas Company marketed the gas from said premises to the city of Vernal, Utah, until the flow of gas dropped below commercial quantities. They then sold the equipment and lease rights to one Juhan with the understanding that the equipment should be removed and the wells and ditches, etc., should be closed. This Juhan did, and it is this fact among others that plaintiff relies upon as evidence of abandonment.

On October 21, 1944 Stock released his interest in the lease to plaintiff Meagher. On November 3, 1944 the Uintah Gas Company and the Valley Fuel Company released their interests to plaintiff, Meagher. On January 19, 1945, Phebus quitclaimed his interest to Juhan.

Briefly the above sets out the chain of title of the various parties concerned, leaving as interested parties in the proceeding, plaintiff Meagher, and defendants Ashley Valley Oil Company and Juhan. Phebus apparently has conveyed what interest he has to Meagher. It may be that some of these transfers and assignments, which so far as the abstract is concerned appear inconsistent, are in fact merely efforts to clear title by relinquishment of possible claims. They do not, however, affect the issues as submitted to us.

In disposing of part of the property, Juhan, executed a bill of sale containing these words:

"That certain one story dwelling house situated about ten miles southeast of Vernal on what is known as the Ashley Valley Oil structure and *old abandoned gas wells.*" (Italics added.)

Furthermore, the evidence indicates that Juhan at one time, subsequent to his acquisition of his interest in the place, sought a lease from plaintiff for drilling upon said premises. The above facts with lapse of time and the disposal of the gas distributing equipment are the foundation of plaintiff's claim of abandonment of the lease.

We come now to the modification of the original lease. While the fee of the land was in Smith, and after the assignment had been made to the Ashley Valley Oil Company and the Utah Oil Company, all then interested parties got together on May 21, 1927 and modified the lease.

Originally the lease was limited to three years and such additional time as gas and/or oil was produced upon the land. Paragraphs 2 and 7 of the original lease read as follows:

"2. It is agreed that this lease shall remain in force for a term of three (3) years from this date and as long thereafter as oil and gas or either of them is produced from said land by the Lessee, subject, however, to the conditions hereinafter stipulated whereby said agreement becomes forfeited and said Lessee agrees to surrender said lease.

"7. The Lessee shall and he hereby agrees to install and erect an adequate and substantial drilling rig and to commence actual drilling of a test well at some point in Township five (5) South of Range Twenty-two (22) East of the Salt Lake Meridian, on the structure on which the lands hereby leased are located, on or before December 4, 1924, and to continue the drilling of said test well with due diligence to the Dakota sands, unless oil or gas in commercial quantities be discovered at a lesser depth: failing in which this lease shall be surrendered, notwithstanding any construction placed on other portions hereof."

The modification of May 21, 1927 eliminated the three year period and changed the foundation of the activity upon the land as follows:

"2. It is agreed that, subject to all and every of the terms and conditions hereinafter contained, this lease shall remain in full force and effect as long and only so long as the Lessee shall fully and timely comply with all and every of his obligations hereunder.

"3. It is understood that a large quantity of petroleum gas was encountered in the test well heretofore caused by the Lessee to be drilled upon said section 23, and, subject to its right of surrender as in paragraph 20 of this agreement provided, the Lessee shall endeavor to secure a profitable market for said gas and for any and all other gas which may hereafter be encountered and/or produced hereunder from the lands the subject of this agreement or from any portion of said lands, and, at all times hereafter when there shall be a profitable market available for any gas encountered and/or produced hereunder from the lands the subject of this agreement or from any portion of said lands the Lessee, subject to such right of surrender, agrees to produce and market same regardless of whether there shall be or shall have been any oil encountered, produced and/or marketed hereunder from any of the lands the subject of this agreement.

"4. The Lessee agrees, on or before September 1st, 1927, to commence or cause to be commenced the actual drilling of an oil well at some point to be selected by the Lessee upon the geologic structure upon which the lands the subject of this agreement are located, and, the drilling of said such well having been so commenced, to cause same or (in the event of the abandonment or loss of said well) the drilling of successive wells as hereinafter in this Paragraph '4' provided, to be diligently continued until in this manner the so called 'Sundance formation,' has been drilled through, unless there shall have been encountered within said Sundance formation in the drilling herein in this Paragraph '4' provided for, oil in commercial quantity (and for the purpose of this Paragraph '4' 'oil in commercial quantity' shall mean and be not less than 100 barrels per day each 24 hour day on a 30 days' continuous test) ; provided, however, and it is agreed that if there shall have been encountered in any of said such drilling (whether in the original well or in any successive well herein in this Paragraph '4' provided for) before same has been completed to the depth hereinabove in this Paragraph '4' provided for, such igneous or other geologic formations or conditions as shall, (in the judgment of the parties hereto or of the arbitrators hereinafter provided for) render deeper drilling or drilling through said Sundance formation unwarranted, the Lessee shall at his election thereupon and thereby be relieved of all further drilling obligations under this Paragraph '4'; provided further and it is further agreed that, if for any other reason the Lessee shall be compelled to abandon or shall lose the original well so commenced as herein in this paragraph '4' provided prior to the completion of drilling through the Sundance formation

or to 'commercial oil' as same is herein in this paragraph defined, then within 60 days after the cessation of said such drilling, the Lessee shall commence the actual drilling of and shall diligently thereafter complete a second well, upon the same terms and conditions, or as many successive wells, upon the same terms and conditions as the Lessee may desire, provided that not more than 60 days shall elapse between the cessation of actual drilling in one well and the commencement of actual drilling in the succeeding well.

"4-a. It is agreed that the Lessee may use free of charge such gas from the lands the subject of this agreement as may be necessary for the drilling of the well or wells provided for in this paragraph '4' whether the same be drilled on or off the lands the subject of this agreement, and that as to the lands the subject of this agreement, the Lessee shall not be charged with, or held responsible for any oil and/or gas used either in development or production operations, or unavoidably lost; and it is also agreed that with respect to any drilling contemplated by this agreement and/or any of its paragraphs or subdivisions, the Lessee shall not be chargeable with or held responsible for unavoidable delays resulting from strikes, fire, unusual weather conditions, unavoidable casualties or other causes beyond his control.

"5. In the event any well, hereinabove in Paragraph '4' provided for, which is drilled upon lands other than the lands the subject of this agreement, shall encounter at any depth therein a quantity of oil amounting to not less than an average of 100 barrels per day on a 30 days continuous test, then within 90 days after so encountering said such 100 barrels of oil (not including the period of said 30 days' test) the Lessee, subject to the right of surrender contained in said Paragraph '20' hereof, shall commence or cause to be commenced the actual drilling of an oil well at some point to be selected by the Lessee upon the lands the subject of this agreement, or, if a well has already been commenced or drilled by Lessee upon the lands the subject of this agreement but not completed into to test any said such horizon upon any other lands than the lands the subject of this agreement so producing said such average of 100 barrels of oil per day, then within said such 90 days' period, the Lessee subject to such right of surrender shall commence or cause to be commenced the deepening thereof by actual drilling, and the drilling or deepening of said such well having been so commenced, to cause same or (in the event of the abandonment or loss of said well) the drilling of successive wells as hereinafter in this paragraph provided, to be diligently continued into to adequately and thoroughly test for oil the horizon in which said such average of 100 barrels of oil per day was so theretofore encountered upon other lands than the lands the subject of this agreement; provided, however, and it is agreed that if for any reason the

Lessee shall be compelled to abandon or shall lose any well herein in this paragraph '5' provided to be commenced or deepened, prior to the completion of drilling into to test said such horizon so producing said such average of 100 barrels of oil per day, then within 60 days after the cessation of actual drilling therein the Lessee subject to such right of surrender shall commence the actual drilling of and shall diligently thereafter complete upon the lands the subject of this agreement, a second well upon the same terms and conditions, or as many successive wells upon the same terms and conditions, as the Lessee may desire, provided that not more than 60 days shall elapse between the cessation of actual drilling in one well and the commencement of actual drilling in the succeeding well; and provided further the provisions of Paragraph '4' hereof with respect to igneous rock or other geologic formations or conditions shall be equally applicable to the drilling operations contemplated by this Paragraph '5'."

At the time of the modification of the lease (May 21, 1927) gas in commercial quantities had been discovered upon the land, and it was this gas that was marketed with the city of Vernal, Utah.

The "Sundance formation" was penetrated by operations under the lease, but no oil in commercial quantities was discovered. No condition arose subsequent to that time that called for further exploration for oil upon the part of the lessee, thereafter, so that as a matter of fact operations ceased upon the land and nothing further was done in the line of explorations after 1928.

In the introductory paragraphs of the lease, its purpose is spoken of as

*"for the sole and only purpose of mining and operating for oil and gas and of laying of pipe lines and of building tanks, power stations and structures thereon to produce, save and take care of said products."*
(Italics added.)

There has been no direct violation on the part of the lessees of any express provision of the lease ,upon which termination of the lease might be founded, nor has any notice of termination been given by the lessor in an effort to accomplish such a termination of the lease in accordance with its terms. We have then two questions to solve: (1) *Does the general provision of the contract to the effect that*

*its purpose is solely and only for the mining and operating for oil and gas contemplate exploration beyond the specific requirements of the contract to avoid its termination?* and (2) *Has there been an abandonment of the gas rights under the lease?*

We are called upon to interpret a contract. That contract bears the name of an "oil and gas lease." However, such nomenclature should not induce us consciously or unconsciously to unduly restrict its intepretation within preconceived classification limits. A brief resume of the terms of the contract, quoted, and also not quoted, is appropriate to our interpretation.

Paragraph 2 thereof provides that the lease shall remain in full force and effect as long and only so long as the lessee shall fully and timely comply with all and every of his obligations under the lease. This is a change from the definite period for termination previously contemplated by the former paragraph 2 thereof. Now what are those obligations?

The first important provision—a general one—is that limiting the use of land solely and only to mining and operating for oil and gas—no other use is permissible. We have quoted that purpose above. There is no contention that that general obligation has been violated. ■
The emphasis upon the words "sole" and "only" is protective of the lessor's greater rights in the land, and to prevent any misconception on the part of the lessee as to the extent of his rights—he can't use the land for agricultural or other purposes. This purpose is expressed in the introductory paragraph of the contract and is definitive of its scope.

There are certain specific obligations:

Paragraph 3: Secure a profitable market for the gas then discovered and for all that may thereafter be encountered and/or produced regardless of success in discovering and marketing oil, and if a profitable market is available produce and market such gas, so encountered and/or produced.

Paragraph 4: Drill wells for oil in the geologic structure upon which the lands under this contract are located. Attention is invited to this clause:

"in the event of the abandonment or loss of said well."

Following this clause are provisions for sinking other wells, with limitation periods of 60 days in which to initiate such additional drilling. Thus a letter or written instrument might very readily refer to "abandoned wells" without necessarily implying that the contract or lease had been abandoned. The additional drilling becomes unnecessary, however, if the Sundance formation is pierced. The expression of this limitation is found to be as follows:

"* * * the drilling of successive wells as hereinafter in the Paragraph '4' provided, to be diligently continued until in this manner the so-called 'Sundance formation' has been drilled through * * *."

Paragraph 5: To initiate drilling or deepening a well on the land under this contract within 90 days of the encountering of oil in the prescribed commercial quantities upon other lands pursuant to the terms of this contract. Here again the expression "abandoned wells" is used, and provision is made for successive well drillings with a similar 60 day limitation period. The drilling of these successive wells was to "adequately and thoroughly test for oil" in this horizon. This is a specific provision of exploration which, incidentally, never matured, as oil was not so encountered.

Paragraph 6: To drill deeper than through the Sundance formation if oil is discovered in a horizon deeper than the Sundance formation anywhere in the Vernal, Utah district or the Northwestern Colorado district. A 90 and 60 day period are again provided, and the successive wells and *abandoned* wells provision is again included. This paragraph clearly extends the contract beyond piercing the Sundance formation:

Paragraph 8: To offset commercially producing wells "by whomsoever drilled" upon other lands than those under this

contract, if the other lands are within 300 feet of the exterior boundaries of the land under this contract.

Paragraph 20: This is an important paragraph. One of the provisions is this:

"* * * the Lessee shall have and is hereby given the right at any time after he shall have fully and timely complied with every and all of his obligations hereinabove in Paragraph '4' set out to * * *"

surrender his interests under the contract. This paragraph recognizes that the contract is a continuing one after compliance with paragraph 4, and also recognizes that said paragraph 4 is the heart of the lessee's obligations.

Paragraph 23: Here again is another important paragraph. It provides that if oil is not discovered in commercial quantities pursuant to the provisions of paragraph 4, the lessor can compel the lessee to duplicate a bona fide offer of others to drill for oil upon said premises. If the duty to continue drilling for oil rested upon the shoulders of the lessee due to the declared purpose of the contract, this paragraph would be inconsistent in its recognition that the lessee did not have to make additional explorations until a bona fide offer to do so had been received by the lessor.

Paragraph 24: Provides for termination of the contract and surrender of the premises by 30 day notice to the lessee of his default as to any obligation.

The remaining paragraphs recognize that the gas rights of the contract and its oil rights are severable; the lessee may give up one and retain the other.

Paragraph 29: Obligates the heirs and assigns of the parties to the contract.

These are the main features of the contract evidencing its limitations. It seems clear that there is no overall exploration obligation either express or implied, that contemplates exploration beyond the specific provisions set out. This is evidenced to some extent and among other ways, by the fact that the lessor never served notice of termination of the contract for breach of such supposed over all requirement (Par. 24). The mere lapse

of time after compliance with the specific obligations is insufficient evidence of abandonment. The contract in effect gives the lessee a continuing interest in the oil and gas of the lands in question if the lessee bears the burden of the expense of compliance with the specific provisions of the contract. Having complied with those provisions the lessee has given consideration for that right. That continuing right is not an unnecessary burden upon the lessor's property as a subsequent discovery of oil in the locality places him in a position to enforce further exploration for oil and gas by the lessee at the latter's risk of losing his continuing rights (Par. 6 and 8). If anyone comes along who thinks there are possibilities in the land, if further exploration is conducted, the lessor's hands are not tied. He may compel the lessee to duplicate the offer of the newly interested party (provided the offer is bona fide) at the risk of losing his rights (Par. 23). If oil is never discovered in the locality, then no harm is done, as the contract gives the lessee no other rights in the land. (Declared purpose above.) It would seem that the parties were careful to protect the interests of both the lessor and the lessee. This contract does not withdraw this land from further exploration, if to leave it free for further exploration is our public policy.

Some suggestion is made that the removal of drilling equipment and rigging is evidence of abandonment. This may have some probative value, but to hold that it is sufficient evidence of abandonment is to accept as true the affirmative of the issue stated initially in this ■ opinion—that is, that exploration beyond the Sundance formation was required. In other words, removal of equipment after piercing of the Sundance formation is consistent with the thought that no more drilling is necessary (except under discovery by others) ; and is inconsistent with the thought that additional exploration is required. Thus its probative value as evidencing abandonment lies in assuming as true the affirmative of the issue— the one with which it is inconsistent, rather than the negative, the one

with which it is consistent. But that is the issue to be decided not assumed.

The question now arises as to whether or not, in view of the fact that the gas rights and the oil rights are severable, there was, by reason of Juhan's actions an abandonment of the gas rights under the contract? We think not. Under the modified agreement the status of the gas rights became something incidental to the oil rights, and were only considered in the light of the requirement of marketing, when and if discovered. Exploring or mining for gas was no longer a mandatory provision of the contract, as it originally was under paragraph 7 (quoted) of the original contract. It is permissible to explore or mine for gas, but it is not required. Thus, if the gas discovered ran out as to commercial quantities there was no obligation on the part of the lessee to explore or mine for gas to keep his rights alive. If, however, additional work was required under the terms of the lease, in the nature of exploring or mining for oil, and gas were discovered in marketable quantities in the process, then the marketing obligation imposed upon lessee became active, and if he then failed to make a reasonable effort to market, he might find that he had jeopardized his gas rights.

A brief consideration of authorities: *Sult* v. *A. Hochstetter Oil Co.*, 63 W. Va., 317, 61 S. E. 307 (cited by respondent). The lease was for a term of five years and as long thereafter as oil or gas should be found in paying quantities, or the rental thereon paid. A paying gas well was developed and used for the five year period and thereafter abandoned as exhausted. No other paying wells were developed. Three years later the lessor leased to another. The lessee had disposed of its rights. The case discusses abandonment as being a matter of intention of the parties evidenced by their acts, and holds there was abandonment here in view of the above facts with additional ones not included in this opinion. However, we wish to invite attention to the fact that the terms of the lease in this case are not the same as the *Sult* case. The term was limited by years and by discovery or lack of

it. That provision was eliminated from the case before this court.

*Boatman* v. *Andre,* 44 Wyo. 352, 12 P. 2d 370 (cited by resopondents). The lessee here ran out of funds and could not comply with the terms of the lease. This lease, too, included the five year limitation period. It had a provision that the lease could be kept alive by payment of rent. By comparison it might be argued: What is the difference between periodical rental, and a lump sum rental then in lieu of lump sum rental a performance of specified work (drilling through Sundance formation) as consideration for keeping lessee's rights alive?—this with term for specified years eliminated.

*Ohio Oil Co.* v. *Reichert et al.,* 343 Ill. 560, 175 N. E. 790 (cited by appellants—criticized by respondent). We do not think this case of much help in the present case. The lease was for three years, and required reasonable diligence in the drilling of any or all wells which lessee "may" drill until oil or gas is found; that in case work ceases, the lessor may demand in writing that it be resumed within 30 days otherwise the lease be considered abandoned and void. The controversy developed within the three year period as to whether or not the lessee had used due diligence in failing to "shoot" the well dug, and the court held that the decision of the lower court that due diligence had been shown should be upheld. No other wells were dug, and the 30 day notice was given. The effect of the decision was to hold that it was unnecessary to drill more than the one well. However, whether you agree with such a conclusion or not, it neither supports nor defeats a factual situation such as we have in the present case. It may have been questionable in that case as to whether or not the lessee was not obligated to drill further on failure of the one well; but in the present case the specific terms of the contract do not require drilling beyond through the Sundance formation, except upon the happening of certain discoveries in the locality, or certain offers by interested third parties.

We are not antagonistic to the principles announced as applicable to the general run of gas and oil leases. What we do say is this: It is a matter of contract between the parties, and their intentions must be gathered from the provisions they have included in their contract. As we view the present case, the lessees have not given up the lease either by acts consistent with its forfeiture terms, nor by acts that will justify a conclusion of abandonment.

The decision of the lower court is reversed, and the case remanded to that court for proceedings to conform to this opinion. Costs to appellants.

McDONOUGH, C. J., and WOLFE, J., concur.

WADE, Justice (dissenting).

I agree with the prevailing opinion that the appellants by complying with the drilling provisions of the lease and failing to discover oil did not thereby have their rights under the lease terminated and that they had the right to continue exploration if they so desired. I cannot agree, however, that in construing the provisions of an oil and gas lease we can do so without bearing in mind the nature of the subject matter. I am of the opinion that the terms of the lease must be interpreted in relation to that subject matter, and the intent of the parties adduced by keeping the objectives of the oil and gas leases in mind.

The leases, both the original and the modified, were given

"for the sole and only purpose of mining and operating for oil and gas and of laying of pipe lines and of building tanks, power stations and structures thereto to produce, save and take care of said products".

Although there is recited in the lease a consideration of one dollar, it is apparent that the real consideration is the exploration, discovery and production of oil and gas, as the only payments provided for are royalties, which of course depend upon discovery and production. The digging of dry wells, no matter how expensive to the lessee, could not be

.of any benefit to the lessor. As we have stated the only way the lessor could benefit was by the actual discovery and marketing of oil and gas whereupon he would be entitled to royalties. This being so, even though lessee had fulfilled the express conditions of the lease as to the depth to which it was obligated to drill, it does not mean that he has rights which cannot be abandoned even though under the express terms of the lease notice must be given to the lessor before he is obligated to explore at a greater depth under certain conditions. That provision was no doubt included so that lessee would not be obligated to drill further unless other persons should want to do further exploration work. However, to say that one is not obligated to do certain things and therefore is not breaching a condition of a contract is not the same as saying that by failing to continue exploration for a great number of years plus the removal of all machinery from the grounds which would tend to accomplish that purpose cannot be evidence of an intent to abandon any rights the lessees may have under the lease. Because of the volatile and fugacious character of oil and gas and because of the speculative nature of oil and gas leases, especially in undeveloped territory, abandonment is more readily found in such leases than in leases pertaining to other types of property. Thornton in his "Law of Oil and Gas," Willis, Sec. 242, page 429, states it thus:

"In view of the nature of the subject matter, abandonment will be more readily found in case of oil and gas leases than in most cases."

And in Sec. 508, page 842, the same author says:

"Where the lessee has actually entered and physically abandoned the premises, the proof of such act shows his intention to abandon his rights under the lease."

The court did not make any finding as to whether there was an intent to abandon the rights to explore for oil, and as to the oil provisions of the lease, it is my opinion that this case should have been sent back to the District Court to make a finding as to what the facts were in that regard.

The oil and gas rights in the lease are severable. As to the gas rights, the court did find that there was an intent to abandon. Gas had actually been discovered and marketed but upon depletion of the supply no attempt was made to find more gas on the lands which were the subject of the agreement; instead, all the equipment was sold with the provision that it be promptly removed. Juhan, as the purchaser of the equipment and the assignee of whatever rights the Valley Fuel Supply Company had in the leases, not only promptly removed but immediately sold all the equipment. From these facts and from the fact that Juhan did nothing further to develop or discover new gas the court could reasonably have found Juhan's attempted explanation that he was unable to do further exploratory work because the war in which we were then engaged made it impossible for him to obtain equipment, was insufficient to overcome all the other facts and circumstances surrounding the transaction. Although Juhan under the terms of his contract with the Uintah Gas Company was obligated to remove the equipment he was not obligated to sell it. The fact that he sold it as quickly as he did clearly shows that he had no intention of using it himself and that he did not intend to do any further work on the lands which were the subject of the agreement. An intent to abandon does not depend upon express statements to that effect but can be inferred from acts and conduct. For discussion as to how much weight is to be given under varying circumstances to a cessation of operations and removal of equipment in finding an intent to abandon see *Sult* v. *A. Hochstetter Oil Co.,* 63 W. Va. 317, 61 S. E. 307, and *Boatman* v. *Andre,* 44 Wyo. 352, 12 P. 2d 370. The prevailing opinion points out that in the above cases the terms of the leases ran for a specified number of years rather than as the lease in this case for

"as long and only so long as the Lessee shall fully and timely comply with all and every of his obligations."

However, as I read these cases it isn't the specific provisions of the leases which determine whether there has been

an abandonment but rather what facts and circumstances in oil and gas leases are sufficient to sustain a finding of an intent to abandon. In *Boatman* v. *Andre,* supra, the court in saying that abandonment will be more readily found in oil and gas leases than in leases of other kinds of property cites with approval the following from *Harris* v. *Riggs,* 63 Ind. App. 201, 112 N. E. 36, 39:

"The rights granted under such leases are for exploration and development. The title or interest granted is inchoate until oil or gas is found in quantities warranting operation, and courts will not permit the lessee to fail in development and hold the leases for speculative or other purposes, except in strict compliance with his contract for *a valuable and sufficient consideration other than such development.*" (Italics ours.)

In the lease in question in the instant case, there is no consideration other than development and I therefore cannot agree with the prevailing opinion that there were not sufficient facts from which the court could have found as it did that there was an intent to abandon the gas rights, even though there are express provisions in the lease for forfeiture, surrender, or notice to continue working. Those provisions are to be considered in determining whether the facts are sufficient to prove an intent to abandon, but they are not conclusive. To my mind the passage of a great number of years and the physical removal of all machinery denoting possession are persuasive factors indicating that the lessee did not consider that further exploration would bring success and therefore decided to withdraw and abandon any rights under the lease.

LATIMER, J., not participating.