W.B. OSBORN, Jr., individually and as trustee of the William B. Osborn, Jr. Trust, Osborn Heirs Company, Marcus Thurman Barrett, III, William Osborn Barrett, and Barrett Wyoming Interests, Ltd., Appellants (Plaintiffs),

v.

ANADARKO PETROLEUM CORPORATION, a Delaware corporation, Appellee (Defendants).

No. 98–27.

Supreme Court of Wyoming.

Feb. 2, 2000.

Representing Appellants: Craig Newman of the Law Office of Craig Newman, Casper, Wyoming.

Representing Appellee: William H. Everett of Williams, Porter, Day & Neville, P.C., Casper, Wyoming; and J. Kyle McClain, Houston, Texas.

Before LEHMAN, C.J., and THOMAS, MACY, GOLDEN, and TAYLOR,* JJ.

THOMAS, Justice.

The only question presented in this appeal requires this Court to determine the legal effect of the term "abandonment" in a Farmout Agreement when an oil and gas well is converted from an extraction well to a water injection well. W.B. Osborn, Jr., individually and as trustee of the William B. Osborn, Jr. Trust, Osborn Heirs Company, Marcus Thurman Barrett, III, William Osborn Barrett,

* *Chief Justice at time of expedited conference; re-* tired November 2, 1998.

and Barrett Wyoming Interests, Ltd. (collectively the Osborn group), entered into a Farmout Agreement with Anadarko Petroleum Corporation (Anadarko) for the drilling of a test well that reserved to the Osborn group a right to convert its net overriding royalty interest to fifty percent of the working interest earned by Anadarko upon abandonment of the well. The Osborn group contends that conversion of the test well from an extraction well to a water injection well [1] by Anadarko was an abandonment, triggering the right of the Osborn group to convert its royalty interest to a fifty percent working interest. In the district court, the parties filed cross motions for summary judgment, and the district court ruled in favor of Anadarko on the ground that the conversion did not constitute abandonment. We hold that the conversion of an oil and gas well from an extraction well to a water injection well is not an abandonment. The Order on Summary Judgment is affirmed.

In the Brief of Appellants, the issue that is raised is:

A. Whether the District Court erred in granting Defendant/Appellee's Motion for Summary Judgment, thereby determining that Appellants had no right under the Farmout Agreement in controversy to convert their overriding royalty interest to a working interest after the Test Well drilled under the Farmout Agreement had become uneconomic, Appellee had removed production equipment from the well and converted the Test Well to a water injection well for purposes of an expanded water flood project benefiting lands other than the lands which were the subject of the Farmout Agreement.

This Statement of the Issues is found in the Brief of Appellee Anadarko Petroleum Corporation:

A. The one and only issue presented for review by this Court is whether or not the District Court correctly granted Defendant/Appellee's Motion for Summary Judgment when the District Court declared that there was *no abandonment* of the Bracken Federal A–1 Well when that well was included in an expanded unit area and subsequently converted to a water-injection well under circumstances where oil production continues to be allocated to the Bracken Federal A–1 Well to the benefit of Plaintiffs. The well is still utilized for injection of water for the benefit of production from the expanded Bracken Minnelusa Unit in furtherance of the State of Wyoming's public policy of encouraging maximum, efficient production of oil and gas resources.

(Emphasis in original.)

The Osborn group and Anadarko agree that there are no disputed issues of fact in this case. On March 21, 1988, the Osborn group and Anadarko entered into a Farmout Agreement, which provided for the drilling of an oil well, the Bracken Federal A–1, by Anadarko on land upon which the Osborn group held the oil and gas lease. Pursuant to the Farmout Agreement, Anadarko would operate the well, and the parties would share in the profits as provided by that agreement. The essence of the arrangement was that Anadarko was entitled to receive from the Osborn group 100% of the leasehold interest of the Osborn group in the land covered by the lease subject to the retained overriding royalty interest held by the Osborn group. The Farmout Agreement included a provision pursuant to which the Osborn group could convert from a royalty interest to a working interest:

We reserve the right, at our option, to convert at payout or abandonment (following production, but prior to payout) at no cost to us, our net overriding royalty interest reserved above, to fifty percent (50%) of the working interest earned by you in and to the Test Well, equipment appurtenant thereto and production therefrom, and the Farmout Lands.

There was no definition in the Farmout Agreement of the term "abandonment."

---

1. Anadarko injected water as part of a secondary recovery operation. According to a leading treatise on the subject, "[t]he primary purpose of injecting gas or water into a reservoir is to cause the injected substances to move from the input wells toward the producing wells, driving the oil or wet gas before them." 1 W.L. Summers, *The Law of Oil and Gas* § 76 at 237 (1954).

The Bracken Federal A-1 well was completed by Anadarko on August 10, 1988. The next month, the Bureau of Land Management (BLM) notified Anadarko that the Bracken Federal A-1 well was located in the same oil producing formation as, and was in pressure communication with, the then existing Bracken Minnelusa Drilling Unit (Minnelusa Unit). The BLM also advised Anadarko that it could expand the Minnelusa Unit to include the new well. Anadarko elected to expand the Minnelusa Unit, and Anadarko then requested permission from the BLM to convert the Bracken Federal A-1 well from oil extraction to water injection. That request was approved by the BLM on October 13, 1989. Upon inclusion in the Minnelusa Unit, the Bracken Federal A-1 well was allotted 15.92164% of the unit production for the life of the unit. That percentage remained the same after the conversion of the Bracken Federal A-1 well from oil extraction to water injection.

On June 27, 1989, the Osborn group sent a letter to Anadarko in which it attempted to exercise its reserved right to convert its royalty interest into a fifty percent working interest. The Osborn group contended that Anadarko's plan to use the Bracken Federal A-1 well for water injection rather than for oil extraction constituted an abandonment of the well. Anadarko responded that the well was not abandoned, and it declined to assign fifty percent of the working interest to the Osborn group. The Osborn group accepted the royalty payments under the Farmout Agreement without objection for several years.

On October 11, 1996, however, the Osborn group filed an action in the district court, seeking a declaratory judgment confirming its right to convert the overriding royalty interest to a fifty percent working interest. Cross motions for summary judgment were presented by the parties on the issue of abandonment. On December 17, 1997, the district court granted Anadarko's motion for summary judgment and denied the motion submitted by the Osborn group. In its Order on Summary Judgment, the district court found that the "tract of land in question is not unproductive, since oil production is being allocated to the tract under the expanded Bracken Minnelusa Unit, and that the well in question is not abandoned since it is still utilized for injection of water for the benefit of production from the expanded Bracken Minnelusa Unit." The Osborn group has appealed from the Order on Summary Judgment.

A summary judgment appropriately may be granted when there is no genuine issue of material fact and the party prevailing on the issue is entitled to judgment as a matter of law. *Century Ready–Mix Co. v. Campbell County School Dist.*, 816 P.2d 795, 798 (Wyo. 1991). In making the determination as to whether any genuine issue of material fact exists, we consider the record in the light most favorable to the party who opposed the motion. *Id.* at 799 (*quoting Doud v. First Interstate Bank of Gillette*, 769 P.2d 927, 928 (Wyo.1989)). In this instance, the parties are in accord that there is no genuine issue of material fact, and the case presents only a question of law.

A farmout agreement is a contract. *Moncrief v. Louisiana Land and Exploration Co.*, 861 P.2d 516, 523 (Wyo.1993). In developing our body of contract law, we have said that summary judgment is an appropriate remedy when a contract is unambiguous because the construction of a contract is a matter of law for the court. *Colorado Interstate Gas Co. v. Natural Gas Pipeline Co. of America*, 842 P.2d 1067, 1070 (Wyo.1992); *Metropolitan Mortg. & Securities Co., Inc. v. Belgarde*, 816 P.2d 868, 873 (Wyo.1991). We also know that a summary judgment is to be upheld on the record presented and under any proper legal theory. *Century Ready–Mix Co.*, 816 P.2d at 799; *Reeves v. Boatman*, 769 P.2d 917, 918 (Wyo.1989). The parties in their statements of the issues set the stage, and, on the record in this case, we deal only with the pure question of law: If an oil well is converted from an extraction well to a water injection well, has there been an abandonment?

The question of abandonment of oil wells is not a novel one in our jurisdiction. Early last century, we quoted the authorities of that day:

"Abandonment is the relinquishment or surrender of rights or property by one person to another. It includes both the intention to abandon and the external act by which the intention is carried into effect." 1 Enc. Law, 1. "In determining whether one has abandoned his property or rights, the intention is the first and paramount object of inquiry, for there can be no abandonment without the intention to abandon." 1 Cyc. 5.

*Phillips v. Hamilton,* 17 Wyo. 41, 51, 95 P. 846, 848 (1908).

In a subsequent case, this Court invoked a different authority, saying "[w]hether there has been an abandonment is to be determined by all the facts and circumstances surrounding each particular case. Mills and Willingham, *Law of Oil and Gas,* § 117." *Boatman v. Andre,* 44 Wyo. 352, 363, 12 P.2d 370, 374 (1932). These concepts relating to abandonment in the oil and gas industry are summarized by a more recent treatise:

Abandonment of an oil and gas lease is the relinquishment by the lessee of rights under the lease, without intention to resume them, or the intentional and voluntary relinquishment of leasehold rights. The question of abandonment of an oil and gas lease is, at least primarily, one of intention. * * *

The requisite intention and relinquishment, and consequent abandonment, may be, and usually are, determined from all the facts and circumstances of the particular case, including the acts and conduct of the lessee.

58 C.J.S. *Mines and Minerals* § 251(b) at 235–36 (1998) (footnotes omitted). Since a working interest represents the interest of a lessee in an oil and gas lease the concepts of abandonment for a lease are the same as those applicable in the case of a working interest.

■ On the basis of these cases and treatises, we are satisfied that the word "abandonment," in the context of the oil and gas farmout agreement, is unambiguous. It connotes an intention to abandon that is coupled with some act of relinquishment. The interpretation of the term "abandonment" is a question of law because it is not an ambiguous term.

In connection with the elements of an abandonment, we recognize that the Farmout Agreement, in Article II(B)(2), provided for a protocol to be followed for abandonment:

If you determine to abandon the Well you will promptly furnish us with an appropriate electrical log acceptable to us and you further agree that you will not abandon the Well as a dry hole until you have furnished said electrical log to us and thereafter given us at least 48 hours notice of your intention to abandon, unless you consent to an earlier abandonment thereof. After consent has been given, you agree to promptly plug and abandon the Test Well in accordance with all the requirements of any governmental body having jurisdiction.

This protocol was not followed which certainly stands as a manifestation of the absence of any intention on the part of Anadarko to abandon the Bracken Federal A–1 well.

The Osborn group and Anadarko have not cited, and we have not unearthed, authority specifically addressing whether the conversion of a well from an extraction well to an injection well results in an abandonment. A federal statute, however, strongly supports Anadarko's contention that it does not. The statute provides:

When separate tracts cannot be independently developed and operated in conformity with an established well-spacing or development program, any lease, or a portion thereof, may be pooled with other lands, whether or not owned by the United States, under a communitization or drilling agreement providing for an apportionment of production or royalties among the separate tracts of land comprising the drilling or spacing unit when determined by the Secretary of the Interior to be in the public interest, and *operations or production pursuant to such an agreement shall be deemed to be operations or production as to each such lease committed thereto.*

30 U.S.C.A. § 226(m) at 49 (Cum.Supp.1999) (emphasis added). The thrust of this statute is that even though a well in a pooled unit might not be operative, it would be considered as maintaining operations or production.

We find further support in a state statute, even though we recognize the Minnelusa Unit was formed under federal law. The Wyoming statute that is instructive on the question of whether such a conversion is an abandonment reads, in pertinent part:

All operations, including, but not limited to, the commencement, drilling, or operation of a well upon any portion of the unit area for all purposes shall be deemed to be the conduct of such operations upon each separately owned tract in the unit area by the owner or owners thereof. The portion of the unit production allocated to a separately owned tract in a unit area shall, when produced, be deemed, *for all purposes, to have been actually produced from such tract* by a well drilled thereon.

Wyo. Stat. Ann. § 30–5–110(k) (Lexis 1999) (emphasis added).

The land upon which the Osborn group held a lease and which was included in the Farmout Agreement was made a part of the Minnelusa Unit. The Bracken Federal A–1 well was drilled on that unit, and oil production on any portion of the Minnelusa Unit is deemed to be production upon the land covered by the Farmout Agreement according to both the federal and the state statutes. Furthermore, the unit production allocated to the Bracken Federal A–1 well is deemed, "for all purposes," to have been actually produced from that well located on the farmout land. These statutes manifest a policy with respect to operations and production on pooled units that appears to be antithetical to the concept of abandonment when a well is removed from production.

█ We conclude that even without considering the state and federal statutes, the declarations of this Court in *Phillips,* 17 Wyo. 41, 95 P. 846 and *Boatman,* 44 Wyo. 352, 12 P.2d 370 stand as clear articulations of the proposition that there can be no abandonment without an intent to abandon and a physical relinquishment. Neither an intent to abandon nor a physical relinquishment appear in the facts presented to the district court or to this Court. We hold, as a matter of law, that the conversion of an oil and gas well from extraction to water injection for purposes of secondary recovery operations, when that well is part of a pooled unit and retains its share of production in the unit, does not constitute abandonment.

The Order on Summary Judgment entered in the district court is affirmed.