UNITED STATES *v.* WYOMING ᴇᴛ ᴀʟ.

No. 10, Original.   Argued April 7, 1947.—Decided June 2, 1947.

*Marvin J. Sonosky* argued the cause for the United States. With him on the brief were *Acting Solicitor General Washington, Assistant Attorney General Bazelon, Walter H. Williams* and *Robert M. Vaughan.*

*Donald R. Richberg* and *C. R. Ellery* argued the cause for defendants. With them on the brief were *Norman B. Gray,* Attorney General of Wyoming, *A. M. Gee, Hal W. Stewart, Harold H. Healy* and *W. H. Everett.*

MR. CHIEF JUSTICE VINSON delivered the opinion of the Court.

The United States filed a complaint in this Court against the State of Wyoming and The Ohio Oil Company to establish plaintiff's title to certain Wyoming lands claimed by the State, and to recover for oil which the

Company has taken from the lands under a lease from the State.[1]

By joint answer, the defendants claimed title in the State, and that both defendants have at all times in good faith believed title to be in the State.

The case was referred to a special master, who heard evidence and argument, and submitted to the Court a report, in which he recommended a decree quieting plaintiff's title to the lands in question, but denying plaintiff any recovery for the oil heretofore taken. Both plaintiff and defendants have entered exceptions to the adverse parts of the report, and the case is now before us on such exceptions.[2]

The lands in dispute are those lying within Section 36, Township 58, Park County, Wyoming. It is conceded that plaintiff originally had title to these lands as part of the public lands of the United States. The master held that the Enabling Act of July 10, 1890,[3] on which defendants rely as the source of their rights, properly construed, would operate to vest title in the State only as of the date that an official survey of the lines of the Section was approved by the Commissioner of the General Land Office, and then only if no inconsistent disposition of the lands had been previously made. The master found, however, that no such survey was made and approved until July 27, 1916. Several months earlier, on December 6, 1915, these lands had been placed in a petroleum reserve by Presidential order.[4]

---

[1] Jurisdiction of this Court is invoked under Article III, § 2, cl. 2, of the Constitution, and § 233 of the Judicial Code (28 U. S. C. § 341). *United States* v. *Texas,* 143 U. S. 621 (1892).

[2] The master's report was filed October 14, 1946. Plaintiff's exceptions thereto were filed on November 29 and defendants' on December 2, 1946. Argument was heard by the Court on April 7, 1947.

[3] 26 Stat. 222.

[4] This order was promulgated under authority of the Act of June 25, 1910, 36 Stat. 847.

Defendants' exceptions to the master's findings and conclusion relating to title give expression to two basic contentions: first, that the Enabling Act immediately vested in the State an indefeasible right to whatever lands would be found on later survey to lie within Section 36; second, that a so-called Coleman survey of 1892 identified Section 36 sufficiently to create then in the State an indefeasible equity, which ripened into full legal title when the complete survey was made and approved in 1916. These contentions will be further elaborated and discussed in order.

Consistent with the policy first given expression in the Ordinance of 1785, the Federal Government has included grants of designated sections of the public lands for school purposes in the Enabling Act of each of the States admitted into the Union since 1802.[5]  This Court has frequently been called upon to construe the provisions and limitations of such grants.  It has consistently been held that under the terms of the grants hitherto considered by this Court, title to unsurveyed sections of the public lands which have been designated as school lands does not pass to the State upon its admission into the Union, but remains in the Federal Government until the land is surveyed.  Prior to survey, those sections are a part of the public lands of the United States and may be disposed of by the Government in any manner and for any purpose consistent with applicable federal statutes.  If upon survey it is found that the Federal Government has made a previous disposition of the section, the State is then entitled to select lieu lands as indemnity in accordance with provisions incorporated into each of the school-land grants.  The interest of the

---

[5] The Land Ordinance of 1785 provided: "There shall be reserved the lot No. 16, of every township, for the maintenance of public schools within the said township; . . . ."  Between 1802 and 1846 the grants were of the 16th section in each township; thereafter, of sections 16 and 36.  In some instances additional sections have been granted.  *United States* v. *Morrison,* 240 U. S. 192, 198 (1916).

State vests at the date of its admission into the Union only as to those sections which are surveyed at that time and which previously have not been disposed of by the Federal Government.[6]

Defendants contend, however, that regardless of the rule generally applicable in school-grant cases, the provisions of the Wyoming Enabling Act are such that upon her admission into the Union in 1890, an indefeasible proprietary interest in Sections 16 and 36 in each township, whether surveyed or unsurveyed, vested immediately in the State, except as to such sections as had been disposed of previously by the Federal Government for other purposes. This interest, it is contended, is of such a nature, as to preclude any appropriation or reservation of unsurveyed Sections 16 and 36 by the Federal Government after the date of Wyoming's admission into the Union. It is defendants' position, therefore, that the order of the President of the United States issued December 6, 1915, which caused the lands here in issue to be included in Petroleum Reserve No. 41, was not sufficient to defeat the State's interest, even if it be assumed that a survey of that section had not been completed at that time. We, accordingly, turn our attention to the provisions of the Wyoming Enabling Act which defendants rely upon to support their contentions.

Section 4 of the Enabling Act provides:

"That sections numbered sixteen and thirty-six in every township of said proposed State, and where such sections, or any parts thereof, have been sold or otherwise disposed of by or under the authority of any act of Congress, other lands equivalent thereto

---

[6] *Wisconsin* v. *Lane,* 245 U. S. 427 (1918); *United States* v. *Stearns Lumber Co.,* 245 U. S. 436 (1918); *United States* v. *Morrison, supra; Minnesota* v. *Hitchcock,* 185 U. S. 373 (1902); *Heydenfeldt* v. *Daney Gold & Silver Mining Co.,* 93 U. S. 634 (1877). And see *Wyoming* v. *United States,* 255 U. S. 489, 500–501 (1921).

. . . are hereby granted to said State for the support of common schools, . . . *Provided,* That section six of the act of Congress of August ninth, eighteen hundred and eighty-eight,[7] . . . shall apply to the school and university indemnity lands of the said State of Wyoming so far as applicable."

Defendants first point to the fact that in the granting clause, Congress employed words of present grant. This is said to evince an intention to vest immediately in the State, not only legal title to sections 16 and 36 when surveyed and not otherwise disposed of, but also an indefeasible proprietary interest in the unsurveyed sections of the school lands. We believe that this contention is precluded by earlier decisions of this Court. In *Heydenfeldt* v. *Daney Gold & Silver Mining Co.,* 93 U. S. 634 (1877), decided some thirteen years before the passage of the Wyoming Act, this Court construed the granting clause of the Nevada Enabling Act, which contains language substantially identical to that of § 4 of the Wyoming Act,[8] as not

---

[7] Section 6 of the Act of August 9, 1888, 25 Stat. 393, provides: "That where lands in the sixteenth and thirty-sixth sections, in the Territory of Wyoming, are found upon survey to be in the occupancy, and covered by the improvements of an actual pre-emption or homestead settler, or where either of them are fractional in quantity, in whole or in part, or wanting because the townships are fractional or have been or shall hereafter be reserved for public purposes, or found to be mineral in character, other lands may be selected by an agent appointed by the governor of the Territory in lieu thereof, from the surveyed public lands within the Territory not otherwise legally claimed or. appropriated at the time of selection, . . . ."

[8] Section 7 of the Nevada Enabling Act, 13 Stat. 30, 32, provides: "That sections numbers sixteen and thirty-six in every township, and where such sections have been sold or otherwise disposed of by any act of congress, other lands equivalent thereto in legal subdivisions of not less than one quarter-section, and as contiguous as may be, shall be, and are hereby, granted to said state for the support of common schools."

immediately vesting in the State title to sections of the school lands unsurveyed at the date of admission.[9] In *United States* v. *Morrison,* 240 U. S. 192, 205 (1916), this Court stated: "We regard the decision in the *Heydenfeldt Case* as establishing a definite rule of construction."

It is significant, also, that three years before the passage of the Wyoming Act, the Secretary of the Interior, in construing the granting clause of the Colorado Enabling Act, which also contains language of present grant, took the position that title to unsurveyed school lands passes to the State only at the date of survey and then only where the Federal Government has made no other disposition of the land prior to that time.[10]

Defendants urge, however, that the pertinent language of the Wyoming Enabling Act should be considered in connection with the legislative history of the Organic Act of 1868,[11] under the authority of which Wyoming was organized into a territory. It is pointed out that § 14 of the Organic Act as originally introduced reserved sections 16 and

---

[9] Defendants assert that the *Heydenfeldt* case cannot be regarded as authority here because in reaching its result in the *Heydenfeldt* case, this Court relied in part upon circumstances peculiar to Nevada. The same argument was rejected in the *Morrison* case, *supra* at 205: "It is also urged that the court emphasized the fact that there had been no sale or disposition of the public lands in Nevada prior to the Enabling Act and therefore that the clause could refer only to future disposition; whereas, in the case of Oregon, there had been earlier provisions for the disposal of the public domain. But Congress used the same phrase substantially in nearly every one of the school grants, and it was the manifest intention to place the States on the same footing in this matter. The same clause, relating to the same subject, and enacted in pursuance of the same policy, did not have one meaning in one grant and a different meaning in another; it covered other dispositions, whether prior or subsequent, if made before the land had been appropriately identified by survey and title had passed."

[10] *State of Colorado,* 6 L. D. 412.

[11] 15 Stat. 178.

36 in each township for school purposes at the time "when the lands in said Territory shall be surveyed, under the direction of the Government of the United States, preparatory to bringing the same into market. . . ." During the course of the debates on the bill, § 14 was amended to eliminate the phrase quoted above, so that as finally enacted the Organic Act made a present reservation of the lands for school purposes.[12]  It is not defendants' contention that § 14 of the Organic Act must necessarily prevail over the provisions of the Enabling Act. It is urged, however, that as a guide to construction, the legislative history of § 14 of the Organic Act clearly indicates an intention on the part of Congress to vest in Wyoming, at the date of its admission as a State, immediate interests in all school lands, whether surveyed or unsurveyed, such as to defeat any subsequent attempts by the Federal Government to reserve the sections for other purposes.

We find the argument unconvincing. During the course of the congressional debates which preceded the amending of § 14 of the Organic Act, concern was expressed by certain members of Congress that delaying the reservation for school purposes until the date of survey would leave open the possibility that the most choice school lands would be settled upon by squatters, preemptors, or homesteaders, prior to survey so as to defeat the reservation of those lands for school purposes. It was apparently to deal with that situation that the amendment was passed. We find nothing in the desire of Congress to preserve the reservation of the school lands against the claim of individual settlers, however, as evincing any intention to strip from the Federal Government the power to deal with those lands in the public interest as authorized by the applicable federal statutes. That Congress did not so intend is indicated by the fact that only four

[12] Cong. Globe, 40th Cong., 2d Sess., 2801–2802.

years after the passage of the Organic Act, Congress reserved a large tract of the public lands in Wyoming for the Yellowstone National Park.[13]   In the Enabling Act, it was specifically provided that Wyoming was not entitled to indemnity for sections 16 and 36 in the townships included within the Yellowstone reservation.   Even as to the rights of individual settlers on the school lands, Congress pursued no consistent course.   Although the amendment to § 14 of the Organic Act apparently was passed to protect the right of the Territory to the school lands against the claim of such individuals, Congress, in the Act of August 9, 1888,[14] gave recognition to the claims of homesteaders and preemptors established prior to survey and granted to the Territory the right to select other portions of the public lands in lieu thereof.   We conclude, therefore, that nothing in the legislative history of the acts passed before the Wyoming Enabling Act gives support to the State's claim to title in this case.

Defendant's principal contention, however, is that, regardless of the construction which might be required if the granting clause of the Enabling Act stood alone, that clause, read in connection with § 5 of the Act, gives clear support to their position.   Section 5 provides as follows:

> "That all lands herein granted for educational purposes shall be disposed of only at public sale, . . .; and such land shall not be subject to preemption, homestead entry, or any other entry under the land laws of the United States, whether surveyed or unsurveyed, but shall be reserved for school purposes only."

Defendants vigorously assert that the phrase "but shall be reserved for school purposes only" completely and irrevocably divested the Federal Government of power

---

[13] Act of March 1, 1872, 17 Stat. 32.

[14] See note 7, *supra*.

to dispose of or to deal with any sections 16 and 36 of the public lands in the State not sold or otherwise disposed of prior to the passage of the Enabling Act. This phrase read in connection with the language of present grant in § 4, it is asserted, reveals a clear intention to vest immediately in the State an indefeasible interest in all such lands. We do not believe that the language should be so construed.

The phrase "but shall be reserved for school purposes only" should not be considered apart from the language which immediately precedes it. The clause beginning with the semicolon in the last sentence in the section clearly and explicitly treats the claims of individuals to school lands asserted under the federal land laws and provides that those claims should not prevail against the State. The phrase upon which Wyoming relies should be construed as an affirmation of the State's interest as opposed to the claims of such individuals. The phrase, however, should not be construed as a limitation on the Federal Government's powers to deal with such lands in a manner consistent with the applicable federal statutes. The powers of the Federal Government with respect to the public lands, as contrasted to the claims of individuals asserted under the land laws, are nowhere mentioned in the section. We think that in the absence of such language, the section should not be construed as a limitation on those powers.[15]

Convincing support for this construction is found both in the legislative history of the language contained in § 5 of the Wyoming Act and in subsequent congressional enactments. Language identical to the last clause of § 5 first appeared as part of § 11 of the Act of February 22,

---

[15] Cf. *United States* v. *United Mine Workers of America*, 330 U. S. 258 (1947); *Guarantee Title & Trust Co.* v. *Title Guaranty & Surety Co.*, 224 U. S. 152, 155 (1912).

1889,[16] the Enabling Act for the States of Washington, Montana, North Dakota, and South Dakota. A bill authorizing the admission of South Dakota, and containing language similar to that later included in § 5 of the Wyoming Act, was first passed by the Senate.[17] When the bill came before the House for consideration, an amendment was approved which struck out all the provisions of the Senate bill following the enacting clause and substituted a bill calling for the admission of Washington, Montana, North Dakota, and South Dakota.[18] As finally passed by the House, the substitute bill provided that rights of settlers to the school lands should be preserved where settlements were made prior to survey or before approval of the Act of admission.[19] The conference committee, however, rejected those provisions; and the Act as passed included language similar to that in the original Senate bill and identical to that later incorporated into the Wyoming Act, providing that the claims of the States to the school sections should prevail over those of the individual settlers.[20] It will be observed that the conflict between the provisions in the House bill and the Senate bill related to the competing interests of the States and the individual settlers. Nothing in this history indicates that by accepting the alternative provided in the Senate bill and resolving the conflict in favor of the States, Congress intended, also, to extinguish the powers of the Federal Government, theretofore exercised, with respect to the

---

[16] 25 Stat. 676.

[17] 19 Cong. Rec. 2802; Sen. Journ. 50th Cong., 1st Sess., p. 696. Section 6 of that bill contained the following language: ". . . ; and such sections shall not be subject to pre-emption or entry, whether surveyed or unsurveyed, but shall be reserved for school purposes only."

[18] 20 Cong. Rec. 806–812.

[19] *Id.* at 948, 951.

[20] *Id.* at 2104, 2116.

unsurveyed sections of the school lands. Nor is there any evidence that Congress intended such a departure from previous practice when it incorporated an identical clause into § 5 of the Wyoming Act. Indeed, the House Committee Report states that the Enabling Act gives to Wyoming "the usual land grants," [21] and the manager of the bill in the House of Representatives during the course of the debates made a similar statement.[22]

Additional support for the construction which we have indicated as proper may be found in subsequent congressional enactments. Thus in the Act of February 28, 1891, which became law only seven months after the passage of the Wyoming Enabling Act, Congress clearly revealed its understanding that the Federal Government had retained its powers to reserve and dispose of the unsurveyed school lands. That Act, the pertinent language of which is set out in the margin,[23] attempts, among other things, to establish a uniform policy with respect to the granting of lieu lands to the States where upon survey it is found that the designated sections are subject to homestead and pre-emption claims or where the Federal Government has included such sections within a reser-

---

[21] H. R. Rep. No. 39, 51st Cong., 1st Sess., 26.

[22] 21 Cong. Rec. 2707.

[23] 26 Stat. 796. "Where settlements with a view to pre-emption or homestead have been, or shall hereafter be made, before the survey of the lands in the field, which are found to have been made on sections sixteen or thirty-six, those sections shall be subject to the claims of such settlers; and if such sections, or either of them, have been or shall be granted, reserved, or pledged for the use of schools or colleges in the State or Territory in which they lie, other lands of equal acreage are hereby appropriated and granted, and may be selected by said State or Territory, in lieu of such as may be thus taken by pre-emption or homestead settlers. And other lands of equal acreage are also hereby appropriated and granted, and may be selected by said State or Territory where sections sixteen or thirty-six are mineral land, or are included within any Indian, military, or other reservation, or are otherwise disposed of by the United States: . . . ."

vation or has disposed of them in some other way. It should be observed that when dealing with the right of the States to select lieu lands where homestead and preemption claims are involved, Congress first inserted language in the Act designed to create in individuals holding such claims rights superior to those of the States to the school sections upon which settlement before survey has been made. But in dealing with the selection of lieu lands where the Federal Government prior to survey has included the designated school sections in a reservation or has otherwise dispcsed of them, Congress did not find it necessary first to create the power in the Federal Government to make such reservations or dispositions. Rather, on the apparent assumption that such powers had been retained by the Federal Government and were presently existing, Congress merely provided for the selection of lieu lands by the States where upon survey it is found that those powers have been exercised. It is apparent that Congress intended that the Act of 1891 should apply to Wyoming as well as to the other school-land States.[24] Indeed, Wyoming on at least two previous occasions so contended and succeeded in obtaining benefits under the Act.[25] We need not now consider the effect of the Act of 1891 insofar as it may be inconsistent with the provisions of the Wyoming Enabling Act, for it is our view that with respect to the problem of this case no inconsistency exists. It is not without significance, also, that in 1934, Congress, after having been fully apprised of the administrative construction of the school-land provisions of the Wyoming Enabling Act,[26] which is in accord with the construction which we have made, amended § 5

[24] H. R. Rep. No. 2384, 51st Cong., 1st Sess.

[25] *Wyoming* v. *United States,* 255 U. S. 489 (1921); *State of Wyoming,* 27 L. D. 35.

[26] H. R. Rep. 229, 73d Cong., 1st Sess.; S. Rep. No. 10, 73d Cong., 1st Sess.

of that Act but reenacted all the provisions of that section which are pertinent to the present case.[27]

Defendants' view that, by virtue of the language of the Enabling Act, Congress extinguished the powers of the Federal Government subsequently to dispose of the unsurveyed school sections in the exercise of its governmental functions, admittedly would place Wyoming in a favored position among the school-grant States. Such a result does not accord with the congressional expectation that the school grant should have "equal operation and equal benefit in all the public land States and Territories." [28] Defendants suggest no special circumstances or peculiar considerations of policy which convincingly indicate a purpose on the part of Congress to place Wyoming on other than an equal footing with other States with respect to the powers of the Federal Government in the unsurveyed school sections.

Furthermore, one of the important recurring problems faced by Congress during the period in which the Wyoming Enabling Act was passed was the necessity of reserving tracts of the public lands to accomplish such important purposes as preserving the national forests and mineral resources, establishing public parks, and the like.[29] Vesting in the State an immediate and irrevocable interest in the school sections before such sections had been identified by survey would be to complicate the performance of the Government's obligation with respect to the public

---

[27] 48 Stat. 350. Section 5 of the Enabling Act was amended so as to permit the State to lease the school lands for periods of ten years as contrasted to a five year limitation contained in the section as originally enacted.

[28] H. R. Rep. No. 2384, 51st Cong., 1st Sess., 1. S. Rep. No. 502, 51st Cong., 1st Sess., 1.

[29] Thus the same volume of the Statutes at Large containing the Wyoming Enabling Act also contains at least two pieces of such legislation. 26 Stat. 478, 650.

454

lands. That Congress intended such complication seems most unlikely when it is observed that the policy underlying the grant of lands to the State for school purposes could be achieved without producing that result. Thus § 4 of the Enabling Act makes provision for indemnification to the State where the designated school sections are disposed of for other purposes by authorizing the selection of lands by the State in lieu thereof. Section 6 of the Act of August 9, 1888,[30] which was incorporated into § 4 of the Enabling Act "so far as applicable," specifically provides for the selection of lieu lands where the school sections "have been or shall hereafter be reserved for public purposes."

It is significant that for a period extending over half a century, the land decisions of the Department of the Interior have consistently taken the position that title to unsurveyed school sections passes to the State only upon completion of the survey, and prior to that time the Federal Government is not inhibited from making such reservations and dispositions of the lands as required by the public interest and as authorized by applicable statutes. Many of those decisions involved statutory language substantially identical to that in the Wyoming Enabling Act.[31] We should be slow at this late date to upset the rulings ". . . of the department of the Government to which is committed the administration of public lands." [32]

For the reasons stated above, we hold that at the date of her admission to the Union, Wyoming acquired no such

---

[30] See note 7, *supra*.

[31] *South Dakota* v. *Riley,* 34 L. D. 657; *State of Montana,* 38 L. D. 247; *State of Utah,* 53 L. D. 365. And see *F. A. Hyde & Co.,* 37 L. D. 164; *State of New Mexico,* 52 L. D. 679. Also in accord are decisions in *Utah* v. *Work,* 55 App. D. C. 372, 6 F. 2d 675 (1925); *Thompson* v. *Savidge,* 110 Wash. 486, 188 P. 397 (1920).

[32] *California* v. *Deseret Water, Oil & Irrigation Co.,* 243 U. S. 415, 421 (1917).

interest in the lands in issue that could not be defeated by the inclusion of those lands in a petroleum reserve by the Federal Government acting prior to survey.

We also think that defendants' reliance on the Coleman survey of 1892 as the basis of an indefeasible equitable right to Section 36 is misplaced, and may be answered briefly.

That survey was undertaken pursuant to a request from the State to the United States Surveyor General that Township 58 be surveyed and subdivided, in order to permit the State to make selections of school lands, and the contract and instructions for the survey so directed. The survey which was then made, however, actually fixed only the boundaries of Township 58, and marked one-mile intervals on those boundaries, but did not subdivide the township. Section 36 lies in the township's southeast corner, and its southern and eastern boundaries are concurrent with part of the southern and eastern township boundaries, but the northern and western section boundaries remained undetermined. This was not a completed survey of Section 36.[33]

Defendants no longer contend that it was. They argue only that it "identified" Section 36, or made it "susceptible of identification by protraction," sufficiently that the State should in equity be held to have acquired vested rights in the Section as of the date this survey was approved. They claim support for this position in several decisions recognizing that the title of certain western railroads granted lands by the United States vested when the line of route was selected and a plan thereof filed, whether or not the adjacent lands had then been surveyed.[34]

---

[33] R. S. 2395, 43 U. S. C. § 751. *Barnhurst* v. *State of Utah,* 30 L. D. 314; *Harris* v. *State of Minnesota,* Copp L. L. (1875–82) 631.

[34] Cf. *Santa Fe Pac. R. Co.* v. *Lane,* 244 U. S. 492 (1917); *St. Paul & Pac. R. Co.* v. *Northern Pac. R. Co.,* 139 U. S. 1 (1891); *Grinnell* v. *Chicago, Rock Island & Pac. R. Co.,* 103 U. S. 739 (1881).

We find no merit in this argument. The railroad land grant cases are not apropos. Not only do they deal with statutes different from the one before us in the present case, but also they have nothing to do with the identification of unsurveyed lands by the protraction of partial surveys. In the *Morrison* case [35] this Court held a completed but unapproved survey inadequate to vest any rights to school lands. *A fortiori,* defendants are not benefited by the Coleman survey.

For the foregoing reasons, defendants' exceptions to the master's findings and conclusions in respect to title are overruled.

Having decided that plaintiff has title to Section 36, we now turn to the question of its right to recover a money judgment because of the defendant Company's oil operations thereon.

It was shown that in 1917, under a lease from the State, the Company entered Section 36 and drilled five wells, some of which are still in production. For the period from the Company's entry on the land until December 31, 1944,[36] there was evidence of the amount and market value of oil produced and of the capital and operating expenses of this production, each by the month, and of the collateral "steam earnings," the royalties and taxes paid to the State, and the overhead expenses allocable to this production, each by the year.[37] For the purpose of proving the bad faith of the trespass, plaintiff offered

---

[35] *United States* v. *Morrison, supra,* note 5.

[36] Accounts for the period January 1, 1945, to date of hearing were to be prepared and submitted later, along with those for any subsequent periods for which defendants might be liable.

[37] The total of each of these items for the entire period was as follows: value of oil produced, $167,049.54; steam earnings, $1,267.99; capital expenses, $118,628.84; operating expenses, $70,083.73; overhead expenses, $22,461.00; taxes, $4,317.40; royalties, $17,306.30. It does not appear what the nature of the so-called "steam earnings" was.

evidence tending to show that defendants knew of plaintiff's claim to the land and realized its superiority over their own claim at least as early as 1929.

This last evidence the master refused to admit. He thought that, in order to recover for a "bad faith" trespass, plaintiff was required to put the question in issue by alleging "bad faith" in the complaint, which it had not done. He also thought that plaintiff's allegation of defendants' claim of right in Section 36 was, in effect, an admission of defendants' good faith. Without having tried the bad faith issue, the master stated that both defendants sincerely believed in their asserted rights, and made a finding of the State's good faith. From this he concluded that plaintiff's recovery should be measured by the gross proceeds realized on the operation, less the proper expenses incurred.

From the other evidence heretofore mentioned, the master found that the total amount of the Company's gross proceeds, including both the value of oil produced and steam earnings, was $168,317.53, and that its total expenses were $232,797.27, including royalties paid in the amount of $17,306.30.[38] He held that all proven elements of the Company's expenses except royalties were properly deductible. As expenses so allowed had been about $47,000.00 greater than gross proceeds, the master concluded that plaintiff should recover nothing.

Plaintiff excepts to these findings and conclusions in several respects. First, it maintains that the pleadings properly framed the issue of bad faith, and contends that the master therefore erred in excluding evidence relating to this issue, and in finding that either or both of the defendants had acted innocently.

---

[38] The totals found by the master are the sums of the appropriate individual items which were in evidence, and which were recited in footnote 37. No question was raised as to the accuracy of any of these figures.

An agreed premise is found in the rule that one who "wilfully" or "in bad faith" trespasses on the land of another, and removes minerals, is liable to the owner for their full value computed as of the time the trespasser converted them to his own use, by sale or otherwise, but that an "innocent" trespasser, who has acted "in good faith," may deduct from such value the expenses of extraction.[39] It is also clear that when suit is brought for the value of minerals wrongfully removed from the plaintiff's land, and the trespass and conversion are established, the burden of pleading and proving good faith is on the defendant.[40] The "good faith" contemplated by these rules is something more than the trespasser's assertion of a colorable claim to the converted minerals.[41]

Thus, in this case, plaintiff's allegation that defendants claimed rights in Section 36, made as a basis for a prayer to have title quieted in plaintiff, cannot be deemed equivalent to an admission of defendants' good faith. Plaintiff also alleged its own title, the lack of any right or title in defendants, that the Company was there engaged in the production of oil, and that the value of the oil theretofore extracted was in excess of $165,000. It then prayed for a recovery of "the full value of all gas, oil, and other

[39] See *Martel* v. *Hall Oil Co.*, 36 Wyo. 166, 178, 253 P. 862, 864, 255 P. 3 (1927); *United States* v. *St. Anthony R. Co.*, 192 U. S. 524 (1904); *Pine River Logging Co.* v. *United States*, 186 U. S. 279 (1902); *Wooden-ware Co.* v. *United States*, 106 U. S. 432 (1882); *United States* v. *Homestake Mining Co.*, 117 F. 481 (C. C. A. 8th 1902); *Winchester* v. *Craig*, 33 Mich. 205 (1876); *Livingstone* v. *Rawyards Coal Co.*, 5 L. R. App. Cas. 25 (H. L. 1880); Summers, *Oil and Gas*, §§ 23, 24.

[40] *Liberty Bell Gold Mining Co.* v. *Smuggler-Union M. Co.*, 203 F. 795, 802 (C. C. A. 8th 1913); *Elkhorn-Hazard Coal Co.* v. *Kentucky River Coal Corp.*, 20 F. 2d 67, 71 (C. C. A. 6th 1927).

[41] *Guffey* v. *Smith*, 237 U. S. 101 (1915); *Benson Mining Co.* v. *Alta Mining Co.*, 145 U. S. 428 (1892). Cf. *Hall Oil Co.* v. *Barquin*, 33 Wyo. 92, 137, 237 P. 255, 270 (1925).

petroleum products extracted from said land by the defendants or either of them." In the answer, besides claiming title and oil rights, defendants averred their good faith belief that they had such rights, which plaintiff traversed in a reply. We have no doubt that these pleadings put the question of defendants' good faith in issue. Obviously, the master's statement in his report that the defendants believed in their asserted rights is unwarranted on the present record. We conclude, therefore, that the master erred in excluding any competent evidence material to the good faith issue, and in finding that either or both defendants acted in good faith.

Second, plaintiff excepts to the master's failure, even on the present record, to make findings of defendants' bad faith and to recommend a decree awarding damages accordingly.[42] It urges, as one ground for this exception, that defendants, having the burden of proof on that issue, failed to introduce sufficient evidence to make a *prima facie* showing of good faith.

For reasons already suggested, we need not consider whether defendants carried that burden. The view that the good faith issue was foreclosed in defendants' favor was expressed by the master before any evidence had been introduced, and consistently throughout the hearing. Even if defendants had doubted the correctness of this view, they were not bound to repudiate it and make an offer of proof of good faith in order to have a trial of the issue if the master should prove to be wrong.

As another ground, plaintiff urges that defendants have at all times since the beginning of this trespass had constructive knowledge of plaintiff's title, and that either they have "intentionally or negligently failed to ascertain

---

[42] The measure of damages claimed by plaintiff's exceptions on the theory about to be stated are, as against the Company, the full proceeds of the oil plus "steam earnings," and as against the State, the amount of royalties received.

from the readily available public records who owned the land," or they have acted "with full knowledge that the section belonged to the United States."

It is clear, however, that constructive knowledge of the owner's title does not demonstrate defendants' bad faith as a matter of law.[43] As to whether an intentional or negligent failure to ascertain the true incidence of title alone constitutes bad faith, we need not now decide, as no such fact has been established.

Plaintiff's alternative contention that we should now enter a finding of defendants' bad faith for the post-1929 period at least, because as to it "there is positive proof that the Company knew . . . the United States, not Wyoming, owned the land," may be answered in the same way. Plaintiff proffered evidence of such knowledge, but we cannot say that this evidence amounted to conclusive proof. We think the necessity of trying the issue of defendants' good faith throughout the entire period in dispute, preliminary to determining the measure of plaintiff's recovery, cannot be avoided.

Third, plaintiff urges and we agree that the master should make special findings—insofar as the parties request, and offer competent evidence to support them—as to the value of the oil produced and the amount and nature of any collateral proceeds from the operation, separately, and as to the amount of each item of income and expense by the month or year. Such action should enable the Court to dispose of the case on the next hearing, regardless of any revisions it might make in the master's findings, conclusions, or recommended decree.

In its exceptions to the master's report and its argument here, plaintiff has raised several other questions, the materiality of each of which depends on whether the trespass

---

[43] *Guffey* v. *Smith, supra,* 237 U. S. at 118.

was committed in good faith.   Obviously, such questions must remain moot until this issue is decided.

The case is recommitted to the master for further proceedings in conformity with this opinion.

*So ordered.*