In re Jack J. GRYNBERG, aka Jack Jakob Grynberg, aka Jack Grynberg aka Jack Grynberg and Associates, dba Jack Grynberg & Associates, Debtor.

Jack J. GRYNBERG, Plaintiff,

v.

TEXAS OIL AND GAS CORPORATION, a Delaware corporation, Florida Exploration Company (formerly Florida Gas Exploration Company), a Colorado corporation and Gulf Oil Corporation, a Pennsylvania corporation, Defendants.

Bankruptcy No. 81 M 2724.

United States Bankruptcy Court, D. Colorado.

Aug. 9, 1982.

---

Phillip G. Dufford and Miles C. Cortez, Jr. of Welborn, Dufford, Cook & Brown, Denver, Colo., for plaintiff Jack J. Grynberg.

Charles W. McDermott and Robert J. Kapelke of Gorsuch, Kirgis, Campbell, Walker & Grover, Denver, Colo., for defendant Gulf Oil Corp.

L. Richard Freese, Jr., and Steven J. Merker of Davis, Graham & Stubbs, Denver, Colo., for defendants Texas Oil and Gas Corp. and Florida Exploration Co.

## MEMORANDUM OPINION AND ORDER

ROLAND J. BRUMBAUGH, Bankruptcy Judge.

The Debtor, Jack J. Grynberg, seeks to quiet title to an oil and gas lease and seeks damages for trespass thereon. The Debtor alleges the disputed lands ("Section 1 lands") are held by production and therefore the Defendants trespassed when they drilled a well on the Section 1 lands. As damages, the Debtor seeks the value of the property taken: all the production from the Section 1 well, less the reasonable drilling costs incurred by the Defendants. Additionally, the Debtor seeks to inure to the benefit of two Farmin Agreements between Texas Oil and Gas Corp. ("Texas") and Chandler and Associates, Inc. ("Chandler") and Texas and W. C. McBride-Silurian Oil Co. ("Silurian")

The Defendants contend that the Debtor's lease to the Section 1 lands expired in

November, 1968 at the end of the primary term for lack of production. Alternatively, Defendants contend that even if the lease as to the Section 1 lands extended beyond the primary term, any interest therein has been abandoned by Grynberg by his lack of activity. Finally, the Defendants assert that if there was a trespass, then the Plaintiff is only entitled to recover the value of the minerals in place and would not be entitled to reap the benefits of independent contracts with third parties.

On November 26, 1963, Josephine R. Dearth Jamieson and Charles V. S. Jamieson executed an oil and gas lease in favor of Arvid D. Ideen, which covered lots 5 and 6 of Section 6, Township 23 North, Range 103 West, 6th P.M. and N ½ SE ¼ of Section 1, Township 23 North, Range 104 West, 6th P.M., approximately 152.32 acres, located in Sweetwater County, Wyoming. The lease carried a primary term of 5 years and continued for "as long thereafter" as hydrocarbons were produced or other specific operations were continued. The lease contained neither a standard pooling clause nor a Pugh clause.[1] The 1963 lease was assigned to the Plaintiff on March 20, 1964 and recorded in Sweetwater County shortly thereafter. Plaintiff paid all of the delay rentals due under the entire 1963 lease from November 26, 1964 to November 25, 1967.

In April of 1965, the Plaintiff, the Jamiesons and the other parties with leasehold interests in Section 6 lands, entered into a communitization agreement to pool the Section 6 lands. Paragraph 8 of the agreement provides for the effect of production on the unit in the following manner:

> The commencement, completion, continued operation or production of a well or wells for communitized substances on the communitized area shall be construed and considered as the commencement, completion, continued operation of production on each and all of the lands within and comprising said communitized area, and operations or production pursu-

ant to this agreement shall be deemed to be operations or production as to each lease committed hereto.

Only the Section 6 lands of the 1963 lease, approximately 72.32 acres, were committed to the communitization agreement.

A commercially productive well ("Section 6 well") was completed in November of 1965 within the Section 6 unit on lands not subject to the 1963 lease. The well continues to produce in paying quantities and is the only well within the communitized area. No well was drilled on the lands covered by the 1963 lease prior to the expiration of the primary term in November, 1968.

On October 26, 1972, the Wyoming Oil and Gas Conservation Commission ordered that all of the lands in Sections 6 and 1, as well as a number of other sections in Township 23 North Ranges 103 and 104 West, be subject to 640 acre drilling units. In effect, this restricts operations to one well in each 640 acre Section.

On April 30, 1974, the Jamiesons and Defendant Gulf Oil Corp. ("Gulf") entered into an oil and gas lease which covered, in addition to other lands, the 80 acres in Section 1 which had been the subject of the 1963 lease (T 23 N, R 104 Wx, 6th P.M.; Section 1: N ½ SE ¼). Gulf thereafter conveyed a working interest in the 1974 lease to Texas and retained an overriding royalty interest.

On May 12, 1978, Texas entered into a Farmin Agreement with Chandler under which Texas was to drill a well in the SE ¼ of Section 1 and Chandler was to assign a working interest in its oil and gas lease covering other lands in Section 1 and an adjacent section. Texas entered into an agreement similar in terms to the Texas-Chandler agreement on August 16, 1978 with W. C. McBride-Silurian Oil Co.

Texas began drilling operations in late 1978 on the disputed lands and a producing gas well was completed in 1979. On March 30, 1979, the parties holding interests in

---

1. A Pugh clause is "a form of a pooling clause designed to cause a severance of the pooled and non-pooled portions of the leasehold in the event of a partial pooling by the lessee." 4 Williams and Meyers, *Oil and Gas Law*, § 670.4 at 94 (1981 Rev.)

Section 1 entered into a communitization agreement pooling all of the lands in Section 1. In August of 1981, some 12 months after discovery, Grynberg informed Texas that the Section 1 well encroached upon land to which he claimed a prior interest under the 1963 lease.

The issues which remain to be decided are: (1) did the Plaintiff's interest in Section 1 lands expire under the terms of the 1963 lease; (2) if no expiration occurred, did Plaintiff nonetheless abandon any interest in those lands, and; (3) if a trespass occurred, what is the correct measure of damages?

The validity of the 1963 lease as to the Section 1 lands depends initially upon the "thereafter" clause of that lease. The lease provides for a primary term of 5 years, continuation during which is dependent upon payment of delay rentals or production and continuation after which is dependent upon production in some form "from said leased premises."

It is undisputed that no well was drilled upon the 1963 lease lands during the primary term. Delay rentals were paid, however, up through November of 1967. Therefore, unless production under the 1965 communitization agreement is attributable to the 1963 lease, the lease expired of its own terms in November of 1967. The communitization agreement provides that operation or production "on the communitized area shall be construed [as operation or production] on each and all of the lands within..." said communitized area. This language requires a finding that production from the Section 6 well is to be attributed to the Section 6 lands of the 1963 lease and therefore carries the lease through and beyond its primary term. *See* 6 Williams and Meyers, *Oil and Gas Law*, § 952 at 704.2 (1981 Rev.). In this the parties are in agreement.

■ The question then becomes the effect of the communitization agreement upon that portion of the 1963 lease not committed to the agreement. While the language itself is subject to differing interpretations, after considering the evidence and testimony of the parties, it is the opinion of this Court that the 1965 communitization agreement caused a severence of the 1963 lease.

Grynberg testified that in his opinion the communitization agreement did not cause a severence of the 1963 lease, but that the Section 1 lands were held by the production of the Section 6 well. The expert witness for the Plaintiff also opined that the Section 6 well held the Section 1 lands by constructive production under the terms of the communitization agreement. He admitted, however, that there is no case law which supports his opinion. He also stated that he based his opinion of non-severence on the lack of either a pooling clause or a Pugh clause in the lease, as inclusion is standard practice in the industry. However, when questioned about the industry standards of 1963, he stated his experience doesn't date back that far.

Plaintiff cites a number of cases as support for his position, though none are an interpretation of Wyoming law. Indeed, a number of the cases relied upon are federal court decisions which in turn are based upon only *dicta* in state court opinions. *See* 6 Williams and Meyers, *Oil and Gas Law*, § 953 at 714 (1971 Rev.) Also, much of the authority relied upon by Plaintiff may be distinguished by the fact that the pooling clause was contained within the original lease, *Brixey v. Union Oil Co.*, 283 F.Supp. 353 (W.D.Ark.1963), or in an amendment to the lease, *Scott v. Pure Oil Co., infra.*

Contradicting Plaintiff's opinion, however, are the following facts. First, the 1963 lease did not contain any authorization to pool within it. Therefore, there is no authority in the lease to continue it as to off-unit production, absent the well being on the leased lands. *Cf. See Scott v. Pure Oil Co.*, 194 F.2d 393 (5th Cir. 1952) in which the Court construed the language of a lease amendment which authorized pooling to extend the lease.

Secondly, the communitization agreement limits the commitment of lands to the lease to those in Section 6; both by legal descrip-

**362**

tion and acreage. By the exclusion of any reference to the Section 1 lands, it is apparent the Jamiesons' intent was to sever the 1963 lease into two leaseholds. This intent is further evidenced by their subsequent behavior. In 1974, the Jamiesons leased the disputed Section 1 lands to Gulf.

■ Even if the 1963 lease did not expire as to the Section 1 lands, Grynberg has abandoned any interest he may have had in those lands. Abandonment "includes both the intention to abandon and the external act by which the intent can be carried into effect." *Phillips v. Hamilton*, 17 Wyo. 41, 95 P. 846, 848 (1908). Grynberg asserts at trial that he had no intent to abandon the Section 1 lands. However, his current verbal claims can be countered by his prior action or inaction. *Boatman v. Andre*, 44 Wyo. 352, 12 P.2d 370 (1932).

Grynberg would have the Court believe that he has been actively developing the entire Nitchie Gulch Field from the 1960's to the present, and therefore had no intent to abandon any interest therein. He proffers a well drilled as recently as 1981 in Section 35, little more than a mile from the disputed lands, as evidence of this fact. However, the contention is that Grynberg abandoned any interest he may have had in the Section 1 lands, not the Nitchie Gulch Field. Also, from Plaintiff's own exhibit (# 8), both the disputed Section 1 lands and the Section 6 lands are outside the Nitchie Gulch Field. This only enhances the Court's finding that the Section 1 lands were abandoned. It is undisputed that Grynberg failed to make any efforts to develop the Section 1 lands and in fact only became interested when he discovered a producing well on what had at one time been his leasehold. Grynberg claims that he discovered the alleged trespass in mid-1980, while working on the Section 35 well. Yet he failed to even give Gulf or Texas any notice of his claimed interest until August of 1981. Grynberg claims that during this approximate 12 month period, he was checking to insure that three annual delay rentals had been made, from 1964–1967. Grynberg also testified that his computer

takes care of delay rental payments automatically. No documentary evidence was produced to substantiate this alleged search. This testimony is simply incredible. It is inconceivable to this Court that it would take over 12 months to determine that three annual payments were made, with no notice of an adverse claim given, and then have the Plaintiff allege that he had no intent to abandon this leasehold.

Finally, Plaintiff contends that it would not have been profitable to drill a well on Section 1 prior to the Natural Gas Policy Act of 1978 due to the low price for gas prior to that time. Even so, Grynberg failed to take any steps to develop the Section 1 lands at any time after 1978, as well. He did not become aware of the Defendants' operations on Section 1, begun in late 1978, until sometime in mid-1980. This is not consistent with an active development interest in the Section 1 lands and because of his lack of activity and the length of time involved, Grynberg has abandoned any interest he may have had in the Section 1 lands.

■ As the 1963 lease expired of its own terms as to the Section 1 lands, or was abandoned by Grynberg, Plaintiff's claim for damages must fail. If, however, Plaintiff were found to have had a valid lease on the Section 1 lands, the Defendants would have been good faith trespassers, (*See* Order upon Defendants' Motion for Summary Judgment, dated April 23, 1982) and entitled to recover the reasonable expenses incurred in drilling the well on Section 1.

Grynberg also argues that he should be able to inure to the benefits of the Defendant's Farmin Agreements with third parties. Plaintiff bases this argument on three factors. One, that the Defendants and third parties proceeded with the presumption that the Defendants held a valid interest in the Section 1 lands and the Court, using its equity power, should merely substitute the parties. Along the same line, Plaintiff argues it could have made the same bargain with the third parties. Finally, the Plaintiff asserts this right based upon the mandatory spacing order imposed

by the Wyoming Oil and Gas Conservation Commission.

 Plaintiff's argument has no basis in the law. The measure of damages is the value of the minerals removed, less the costs of extraction. *United States v. Wyoming*, 331 U.S. 440, 458, 67 S.Ct. 1319, 1328, 91 L.Ed. 1590, *rehearing denied*, 332 U.S. 787, 68 S.Ct. 37, 92 L.Ed. 370 (1947), *motion granted*, 333 U.S. 834, 68 S.Ct. 601, 92 L.Ed. 1118 (1948). There is no foundation, either in law or in equity, to grant Plaintiff the windfall he seeks. Any contracts which the Defendant Texas entered into with third parties were wholly independent of the Defendant's leasehold interest in the Section 1 lands. Plaintiff further asserts that he could have made the same bargains with Chandler and Silurian. This contention is merely speculative and could not be the basis for an assessment of actual damages.

It is therefore ORDERED that the within complaint be and is hereby dismissed, each party to bear its own costs.

Further ordered that within 10 days of the date of this order, any party may file a written request for the withdrawal of his exhibits received in evidence or in the possession of the Court. Upon conclusion of all appellate review pertinent hereto, or upon expiration of time to initiate such review, as the case may be, exhibits so requested shall be returned. Thereafter, the Clerk may destroy or otherwise dispose of any exhibits not requested and returned in accordance with this order.