Vernon MASAYESVA, Chairman of the Hopi Tribal Council of the Hopi Indian Tribe, for and on behalf of the Hopi Indian Tribe, Plaintiff,

v.

Peterson ZAH, Chairman of the Navajo Tribal Council of the Navajo Indian Tribe, for and on behalf of the Navajo Indian Tribe, Defendant,

v.

Evelyn JAMES, et al., Intervenors.

No. CIV 74–842 PCT EHC.

United States District Court,
D. Arizona.

March 13, 1992.

James E. Scarboro, David C. Warren and Richard P. Barkley, Arnold & Porter, Denver, Colo., for plaintiff.

Terry E. Fenzl and John W. Rogers, Brown & Bain, P.A., Phoenix, Ariz., for defendant.

K. Jerome Gottschalk, Robert M. Peregoy and Edgar T. Bristow, Native American Rights Fund, Boulder, Colo., for intervenors.

## ORDER

## RE: SCHOOL LANDS

CARROLL, District Judge.

Defendant Peterson Zah, on behalf of the Navajo Nation,[1] moves for partial summary judgment, requesting that this Court find that the Hopi Tribe and San Juan Southern Paiute Tribe ("the Paiutes" or "Paiute Tribe") do not have a claim to lands designated to the State of Arizona "for the support of common schools" in the Arizona Enabling Act. This is one of a number of motions for partial summary judgment by the Navajo Nation seeking to exclude certain categories of land from the adjudication of Hopi and Paiute interests in the 1934 Navajo Reservation.[2] The Hopi Tribe has cross-motioned for partial summary judgment.

Under Section 1 of the Act of June 14, 1934, 48 Stat. 960 (the 1934 Act), "all vacant, unreserved, and unappropriated public lands ... are permanently withdrawn from all forms of entry or disposal for the benefit of the Navajo and such other Indians as may already be located thereon ..." The Navajo Nation claims that the "school lands" designated in the Arizona Enabling Act are not "vacant, unreserved, and unappropriated", and thus are not subject to Hopi and Paiute claims. In order to be successful in this argument, the Navajo Nation must demonstrate both that the land at issue was granted to the State of Arizona pursuant to the Enabling Act, and that this grant renders the school lands "reserved" or "appropriated" within the meaning of the 1934 Act.

In relevant part, Section 24 of the Arizona Enabling Act states as follows:

> That in addition to sections sixteen and thirty-six heretofore reserved for the Territory of Arizona, sections two and thirty-two in every township in said proposed State *not otherwise appropriated at the date of the passage of this Act* are hereby granted to the said State for the support of common schools and where sections two, sixteen, thirty-two, and thirty-six, or any part thereof ... *have been sold, reserved, or otherwise appropriated or reserved by or under the authority of any Act of Congress, ... the provisions of section [2275 and 2276]* of the Revised Statutes, [43 U.S.C. §§ 851 and 852], and Acts amendatory thereof or supplementary thereto, *are hereby made applicable thereto and to the selection of lands in lieu thereof* to the same extent as if sections two and thirty-two, as well as sections sixteen and thirty-six, were mentioned therein ...

Act of June 20, 1910, § 24, 36 Stat. 557, 572 (1910) (emphasis added). "The Enabling Act of each of the public-land states admitted into the Union since 1802 has included grants of designated sections of federal lands for the purpose of supporting public schools." *Andrus v. Utah*, 446 U.S. 500, 506, 100 S.Ct. 1803, 1807, 64 L.Ed.2d 458, *reh. denied*, 448 U.S. 907, 100 S.Ct. 3051, 65 L.Ed.2d 1137 (1980).

The Hopi Tribe argues that land previously withdrawn "for Indian purposes" pursuant to Executive Orders did not pass to the State pursuant to the "school lands"

---

1. The Navajo Tribal Code, 1 N.T.C. § 301, requires officials of the Navajo Tribe to use the term "Navajo Nation" rather than "Navajo Tribe." Throughout this Order, the Court will use the term employed by the Navajos.

2. The Navajo Nation also seeks to exclude lands allotted where patents had been issued to indi-

vidual Indians, lands allotted where patents had not issued, lands purchased by or on behalf of the Navajo Tribe before 1934, and privately-owned lands relinquished pursuant to section 2 of the 1934 Act or purchased by or for the Navajo Tribe after 1934. These issues will be addressed in separate orders.

**1174**

provision since land included in Executive Order Reservations had been *otherwise appropriated* at the date of the passage of the Enabling Act.[3]

The Navajo Nation, in turn, argues that Executive Order Reservation land was not "sold, reserved, or otherwise appropriated or reserved by or under the authority of any *Act of Congress*" as that land was withdrawn for Indian use pursuant to *executive* action. The Navajos contend that Indians are tenants at will while occupying an Executive Order Reservation, and "Congress has plenary authority to control use, grant adverse interests or extinguish Indian title", citing *Sekaquaptewa v. MacDonald,* 448 F.Supp. 1183, 1189 (D.Ariz. 1978), *aff'd in part, rev'd in part,* 619 F.2d 801 (9th Cir.), *cert. denied,* 449 U.S. 1010, 101 S.Ct. 565, 66 L.Ed.2d 468 (1980).

The Hopi Tribe counters that requiring an Act of Congress would read the first "reserved" out of the phrase "sold, *reserved,* or otherwise appropriated or reserved by or under the authority of any Act of Congress", and argues that effect must be given to every word or clause of a statute, citing 2A N. Singer, *Statutes and Statutory Construction,* § 46.06 (1984 ed. and 1989 Cum.Supp.).

More significantly, the Supreme Court has held that title to school lands cannot pass to a state subsequent to the creation of an Executive Order Reservation. *See United States v. Oregon,* 295 U.S. 701, 703, 55 S.Ct. 879, 879–80, 79 L.Ed. 1663 (1935) ("The surveys ... were approved subsequent to the establishment of [an Executive Order Reservation], which appropriated these lots as a part of the Reservation, and no title or interest in them passed to the State of Oregon"). *See also, United States v. Southern Pacific Transportation Co.,* 601 F.2d 1059, 1066 (9th Cir.1979) (the creation of an Executive Order Reservation appropriated school lands prior to

survey under Section 7 of the California Enabling Act, 10 Stat. 244 (1853)).

█ Further, selection of lieu lands in the Arizona Enabling Act is subject to the provisions of 43 U.S.C. § 851, which provides for the selection of lieu lands where, before title could pass to the States, lands are "included within any Indian, military, or other reservation, or are, before title could pass to the State, otherwise disposed of by the United States." There is no requirement in 43 U.S.C. § 851 that the Indian reservation be one created by Congress.

█ Moreover, the State of Arizona selected lieu lands in exchange for school land sections located within the Executive Order Reservations prior to 1934. (See Exhibit 1 to Second Affidavit of Melanie Morris, attached to Hopi Reply indicating parcels selected in 1918 as indemnity lieu lands). This indicates that both Arizona and the United States treated land in Executive Order Reservations as "previously appropriated" under the Enabling Act since lieu lands were selected.

This Court therefore finds that land withdrawn pursuant to Executive Orders was "previously appropriated" within the meaning of the Arizona Enabling Act, and that the State of Arizona could not assert an interest in that land pursuant to the Enabling Act. Lands withdrawn pursuant to Executive Orders prior to the Enabling Act are therefore "unreserved" within the meaning of the 1934 Act, and not excluded from Hopi and Paiute claims.

Although this conclusion subjects a vast majority of the "school lands" to the claims of the Hopi and Paiute Tribes, in order to complete the record this Court will address the Navajo argument that both surveyed and unsurveyed "school lands" are "re-

**3.** Although both the Enabling Act and the 1934 Act use the term "appropriated", they have different meanings. For instance, land may be found to be "appropriated" within the meaning of the Enabling Act, but "not appropriated" within the meaning of the 1934 Act. To avoid confusion on this issue, the Order will refer to

land as "appropriated" or "non-appropriated" under the Enabling Act, and "reserved" or "unreserved" under the 1934 Act. "Reserved" and "appropriated" are deemed to have the same meaning under the 1934 Act for purposes of this Order.

served" within the meaning of Section 1 of the 1934 Act.[4]

▇▇ The Hopi Tribe concedes that *surveyed* school lands may be "reserved" under Section 1. When school lands are surveyed, and the survey is approved by the General Land Office, the State of Arizona's interest in those lands vests. *United States v. Wyoming*, 331 U.S. 440, 443–44, 67 S.Ct. 1319, 1322, 91 L.Ed. 1590, *reh. denied*, 332 U.S. 787, 68 S.Ct. 37, 92 L.Ed. 370 (1947); *Beecher v. Wetherby*, 95 U.S. 517, 524, 24 L.Ed. 440 (1877). However, the Hopi Tribe has demonstrated that some of the surveyed parcels were surveyed *after* land containing those parcels had been withdrawn pursuant to Executive Order.[5] These parcels are subject to Hopi and Paiute claims since the State of Arizona did not obtain a vested interest in them, rendering the parcels "unreserved" under the 1934 Act.

Contrary to surveyed school lands, the Hopis argue that *unsurveyed* school lands were "unreserved" within the meaning of Section 1. The Hopi Tribe contends that where the land had not been surveyed, the State did not have a vested interest in the land. In *Wyoming*, 331 U.S. at 443–44, 67 S.Ct. at 1321–22, the Supreme Court stated,

> [T]itle to unsurveyed sections of the public lands which have been designated as school lands does not pass to the State upon its admission into the Union, but remains in the Federal Government until the land is surveyed. Prior to survey, those sections are a part of the public lands of the United States and may be disposed of by the Government in any manner and for any purpose consistent with applicable federal statutes. If upon

survey it is found that the Federal Government has made a previous disposition of the section, the State is then entitled to select lieu lands as indemnity in accordance with the provisions incorporated into each of the school-land grants. The interest of the State vests at the date of its admission into the Union only as to those sections which are surveyed at that time and which previously have not been disposed of by the Federal Government.

The Supreme Court has reached similar results as to other state Enabling Acts. *See Andrus*, 446 U.S. at 507, 100 S.Ct. at 1807 (interpreting the Utah Enabling Act, 28 Stat. 109 (1894)); *United States v. Morrison*, 240 U.S. 192, 204–05, 36 S.Ct. 326, 330–31, 60 L.Ed. 599 (1916) (the Oregon Admission Act, 11 Stat. 383 (1859)); *Heydenfeldt v. Daney Gold & Silver Mining Co.*, 93 U.S. 634, 640, 23 L.Ed. 995 (1877) (Nevada Enabling Act, 13 Stat. 30 (1864)).

The Navajo Nation argues that it is not necessary that the State of Arizona have title to the land, but only that the State's interest be sufficient to take the land out of the "unreserved" public lands category of Section 1. The Navajo Nation points to the language of the Enabling Act that in addition to those sections "heretofore *reserved* to the Territory of Arizona" additional sections were "*granted* to the said State" (emphasis added).

▇▇ However, the Supreme Court has explicitly rejected that the word "grant" in an Enabling Act transfers an interest to a State in the *specific* sections of school lands. *Wyoming*, 331 U.S. at 445, 67 S.Ct. at 1322. The Arizona Enabling Act gave the State an interest in the *quantity* of

---

**4.** This argument assumes that the school lands were not "previously appropriated" by the Executive Order Reservations under the Arizona Enabling Act.

**5.** Parcels originally designated as school lands are set forth in Exhibit A to the Navajo Nation's memorandum in support of its motion for partial summary judgment. The list was derived from a data ·compilation obtained from the Arizona State Land Department, called the "Land Master Record", attached as Exhibit 1 to the Affidavit of Richard Oxford. Exhibit 2 to the

Second Affidavit of Melanie Morris is a summary listing survey and withdrawal dates of various parcels of school lands listed in Exhibit A to the Navajo motion. Each parcel listed in Exhibit 2 either was not surveyed or was surveyed after withdrawal. Because this exhibit was attached to the Hopi reply to its cross-motion, the Navajo Nation could not respond to Ms. Morris' designation of survey dates. Therefore, summary judgment will be reserved as to the status of particular · parcels, subject to any objections by the Navajo Nation.

unsurveyed land designated, but no interest in specific parcels of land. As the Supreme Court stated in *Heydenfeldt*, 93 U.S. at 640:

> [T]he evident intention [of Congress was] ... to grant to the State *in praesenti* a quantity of land equal in amount to the 16th and 36th sections. Until the *status* of the lands was fixed by a survey, and they were capable of identification, Congress reserved absolute power over them ...

*See also, Morrison*, 240 U.S. at 200, 36 S.Ct. at 329 ("it was not important to the State that it should receive specific lands, if suitable indemnity were given ... The designation of these sections was a convenient method of devoting a fixed proportion of public lands to school uses.").

Although the Navajo Nation argues that each state's Enabling Act must be looked at individually, the Supreme Court has held that grants of school lands should have "equal operation and equal benefit in all the public land State and Territories." *Wyoming*, 331 U.S. at 453, 67 S.Ct. at 1226 (quoting H.R.Rep. No. 2384, 51st Cong. 1st Sess. 1; Sen.Rep. No. 502, 51st Cong., 1st Sess. 1.). "[I]t was the manifest intention [of Congress] to place the States on the same footing in this matter." *Morrison*, 240 U.S. at 205, 36 S.Ct. at 331. The Navajo Nation has not successfully demonstrated to this Court that the Arizona Enabling Act should be construed differently than those which have been analyzed by the Supreme Court.[6]

Further, the reason Enabling Acts do not reserve interests in specific parcels of land is evident in this case.

> [I]t might appear before surveys were had that there were important public interests which in the judgment of Con-

gress should be subserved by some other disposition of lands of a particular character. On the other hand, it was not important to the state that it should receive specific lands, if suitable indemnity were given.

*Morrison*, 240 U.S. at 200, 36 S.Ct. at 329. If the State of Arizona had gained a vested interest in specific sections of land, the United States would have been greatly hindered in its efforts to establish reservations for the Navajo Nation.

Finally, the Navajo Nation urges this Court to adopt the reasoning of *Andrus*, 446 U.S. at 511, 100 S.Ct. at 1809, in which the Supreme Court stated that the withdrawal of federal lands for grazing districts under the Taylor Grazing Act, 48 Stat. 1269 (1934), did not affect the original school land grants, whether or not they had been surveyed. The Navajo Nation contends that the same policy should be applied in this case since the Taylor Grazing Act was also passed in 1934, and thus indicates Congressional intention regarding the status of unsurveyed land in the 1934 Reservation. However, as the Hopi Tribe points out, the Taylor Grazing Act expressly states that it would not effect unsurveyed school lands, and the Navajo argument is therefore unpersuasive.

Thus, this Court finds that unsurveyed lands are "unreserved" within the meaning of Section 1 of the 1934 Act.[7]

Alternatively, the Navajo Tribe argues that even if the school lands are unreserved and unappropriated under Section 1, the school lands were "relinquished" by the State pursuant to Section 2 of the 1934 Act, and were therefore placed in trust for the exclusive benefit of the Navajo Nation. Section 2 provides:

---

**6.** The Navajo Nation argues that the legislation relating to the New Mexico territory (of which Arizona was once a part) required that school sections be surveyed prior to the vesting of an interest. *See,* Section 15, Act of September 9, 1850, 9 Stat. 446, 452. In contrast, the statehood enabling act did not explicitly require a survey, which the Navajo Nation argues indicates Congress' intention that survey was not necessary for the State's interest to vest. This argument is not persuasive, and the Navajo Na-

tion fails to distinguish Arizona's Enabling Act from the others cited which also do not have explicit requirements of survey.

**7.** Unsurveyed parcels are listed in Exhibit 1 to the Affidavit of Melanie Morris, attached to the Hopi Tribe's Cross–Motion. The Navajo Nation did not dispute the information provided therein, and partial summary judgment will be granted to the Hopi Tribe as to these parcels.

The State of Arizona may relinquish such tracts of school land within the boundary of the Navajo Reservation, as defined by section 1 of this Act, as it may see fit in favor of said Indians, and shall have the right to select other unreserved and non-mineral public lands ...[8]

The Navajo Nation argues that since the school lands were "relinquished" pursuant to Section 2, it is irrelevant whether or not those lands are "unreserved" under Section 1 of the 1934 Act.

The Hopi Tribe contends that most of the lands in question were not exchanged pursuant to Section 2 of the Act. Clerical notations in the "Land Master Record" of the State of Arizona Land Office indicate that a majority of the lands are designated as lieu lands transferred to the State of Arizona pursuant to the Arizona Enabling Act. (See Affidavit of Richard Oxford). The Navajo Nation argues that to the extent ministerial notations reflect inconsistency with Congressional intent that the lands be exchanged pursuant to the 1934 Act, those notations do not control the legal status of land. This Court agrees that the State of Arizona's records are not determinative in this matter, but are evidence to be considered.

■ This Court finds that Section 2 providing for the relinquishment of school lands includes only those school lands in which the State had a vested property interest; i.e. those school lands that were surveyed prior to the passage of the 1934 Act and which had not been "previously appropriated" by Executive Order withdrawal. The Reservation created by Section 1 would not include those parcels of school lands in which the State had a vested interest since those lands were not "unreserved". Without Section 2, there was no mechanism to allow the exchange of lands in which the state's interests had vested, since the Enabling Act provided only for the exchange of which had been "previously appropriated". Thus, unless Congress provided for the exchange of

school lands in which Arizona had a vested interest, the 1934 Reservation would have contained a number of parcels which were not Indian land, which was contrary to the purpose of the 1934 Act to consolidate the boundaries of the Navajo Reservation. Although it is possible that Congress also intended that unsurveyed lands could be exchanged pursuant to Section 2 of the Act, these lands could already be exchanged pursuant to the Enabling Act. Further, no evidence has been presented to this Court that Congress intended Section 2 to include unsurveyed school lands.

In determining the extent of the Hopi's interests in the 1934 Reservation, the Court in *Sekaquaptewa* stated, "The only meaning th[e] clause [such other Indians as may already be located thereon] could plausibly be given in light of the legislative history is to protect the rights and interests of the Hopi tribe to the land they were occupying and using outside the 1882 Reservation on June 14, 1934." *Sekaquaptewa*, 448 F.Supp. at 1196. Absent strong reason, this Court will interpret the 1934 Act to allow the Hopi Tribe to assert its rights in lands it occupied.

In summary, this Court finds that all unsurveyed parcels of school land are "unreserved" and thus subject to Hopi and Paiute claims under the 1934 Act. Summary judgment will therefore be granted to the Hopi Tribe as to those parcels listed as unsurveyed in Exhibit 1 to the Affidavit of Melanie Morris, attached to the Hopi Tribe's cross-motion for partial summary judgment.

Also, all parcels of school lands surveyed prior to withdrawal of the land pursuant to Executive Order are "reserved" and are not subject to Hopi and Paiute claims. Parcels of school lands surveyed after withdrawal of the land pursuant to Executive Order are "unreserved" and subject to Hopi and Paiute claims. However, summary judgment as to surveyed parcels is not appropriate at this time since the Nava-

---

**8.** The Hopi Tribe does not dispute that the refer-    ence to "said Indians" is to Navajo Indians.

jo Nation has not been afforded the opportunity to refute the survey dates provided by the Hopi Tribe. The Navajo Nation must submit any objections to the survey dates set forth in Exhibit 2 to the Second Affidavit of Melanie Morris, attached to the Hopi Tribe's reply to its cross-motion, within 30 days of the date of this Order. The Court will then enter summary judgment as appropriate.

Accordingly,

IT IS ORDERED that all unsurveyed parcels of school land are "unreserved" and thus subject to Hopi and Paiute claims under the 1934 Act; partial summary judgment is thus granted to the Hopi Tribe in part as to those parcels listed as unsurveyed in Exhibit 1 to the Affidavit of Melanie Morris, attached to the Hopi Tribe's cross-motion for partial summary judgment.

IT IS FURTHER ORDERED that all parcels of school lands surveyed prior to withdrawal of the land pursuant to Executive Order are "reserved" and not subject to Hopi and Paiute claims, and that parcels of school lands surveyed after withdrawal of the land pursuant to Executive Order are "unreserved" and subject to Hopi and Paiute claims.

IT IS FURTHER ORDERED that the Navajo Nation shall submit any objections to the survey dates set forth in Exhibit 2 to the Second Affidavit of Melanie Morris, attached to the Hopi Tribe's reply to its cross-motion, within 30 days of the date of this Order.